NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

JOHN WILLIAM MCKELVEY III,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-12419
Trial Court No. 4FA-14-00040 CR

O P I N I O N

No. 2675 — September 4, 2020

Appeal from the Superior Court, Fourth Judicial District, Fairbanks, Bethany Harbison, Judge.

Appearances: Robert John, Law Office of Robert John, Fairbanks, for the Appellant. Timothy W. Terrell, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, Wollenberg, Judge, and Mannheimer, Senior Judge.[*]

Judge WOLLENBERG.

This case involves an issue of first impression in Alaska: Must the police obtain a search warrant before conducting targeted aerial surveillance of a residential backyard, using a telephoto lens to discern objects that would not otherwise be visible

---

[*] Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

from that height, when the property owner has taken steps to protect the ground-level privacy of the yard?

For the reasons explained in this opinion, we conclude that, under such circumstances, the aerial surveillance constitutes a search under the search and seizure clause of the Alaska Constitution. Accordingly, absent an applicable exception to the warrant requirement, the police must obtain a search warrant before engaging in this type of aerial surveillance.

*Background facts and prior proceedings*

On August 22, 2012, Alaska State Trooper Joshua Moore received a tip from an informant who reported observing a marijuana grow at the residence of John William McKelvey III. The informant stated that McKelvey had approximately thirty marijuana plants growing in his yard, that the marijuana was planted in five-gallon buckets, and that McKelvey would move the plants into his greenhouse at night.

McKelvey lived in a sparsely populated area approximately twenty miles from Fairbanks. He had posted numerous "No Trespassing" and "Keep Out" signs along his driveway and elsewhere on his property. The greenhouse area where the marijuana plants were located was about ten to fifteen feet behind his house, and it was surrounded by a sight barrier of tall woods.

Trooper Moore, hoping to confirm the informant's tip through aerial surveillance, had a wildlife trooper fly him near the property at an altitude of at least 600 feet. During this flyover, Moore passed by McKelvey's property twice, and he took photographs of the property using a camera equipped with a 280-millimeter zoom lens.

Moore did not see any plants or five-gallon buckets sitting in McKelvey's yard, but, through the lens of his camera, he could see "what appeared to be plants potted

inside five-gallon buckets" through the walls of a "partially see-through" greenhouse. Moore could not discern whether these plants were marijuana.

Based on the informant's tip, and based on the results of this aerial surveillance, Moore applied for a warrant to search McKelvey's property.

When the state troopers executed this search warrant, they discovered a marijuana grow (as well as methamphetamine, scales, plastic bags used for packaging, a loaded firearm, and over $18,000 in cash). A grand jury subsequently indicted McKelvey on six counts of misconduct involving a controlled substance and one count of second-degree weapons misconduct (for possessing a firearm during the commission of a felony drug offense).[1]

Prior to trial, McKelvey asked the superior court to suppress the evidence seized from his property during the execution of the search warrant. McKelvey argued that Moore's aerial surveillance of his yard constituted an illegal warrantless search in violation of the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Alaska Constitution. McKelvey further argued that, because this surveillance was a critical part of Moore's application for the search warrant, all evidence seized from his property under that warrant should be suppressed.

The court held an evidentiary hearing on McKelvey's motion. At this hearing, Moore explained that he was only able to see the buckets in the greenhouse by using the telephoto lens of his camera.

Following this hearing, the superior court denied McKelvey's motion. The court agreed with McKelvey that the greenhouse was part of the curtilage of his residence, and the court accepted McKelvey's contention that he had a subjective

---

[1]   Former AS 11.71.020(a)(1) (2012), former AS 11.71.030(a)(1) (2012), former AS 11.71.040(a)(2), (a)(3)(F), (a)(3)(G), & (a)(5) (2012), and AS 11.61.195(a)(1), respectively.

expectation of privacy in the semi-opaque greenhouse. Nevertheless, the court concluded that McKelvey's expectation of privacy in his greenhouse was objectively unreasonable. The court found that the contents of the greenhouse were open to public view from the navigable airspace above McKelvey's residence, and the court further found that McKelvey could not reasonably have believed that no one would fly over his property. The court noted that air travel (in both commercial and private aircraft) is an essential feature of Alaskan life, and that a private airstrip was located a short distance from McKelvey's property.

The court also rejected McKelvey's argument that Moore's use of a telephoto lens to enhance his view of McKelvey's property transformed the aerial surveillance into an unconstitutional search.

After the court denied this suppression motion, McKelvey waived his right to a jury trial and proceeded to a bench trial based on stipulated facts. The court found him guilty of one count of second-degree weapons misconduct and one count of third-degree misconduct involving a controlled substance (possession of methamphetamine with the intent to distribute).[2] The State dismissed the remaining charges.

This appeal followed.

*Our analysis of McKelvey's claims*

Both the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Alaska Constitution prohibit unreasonable searches by the

---

[2] AS 11.61.195(a)(1) and former AS 11.71.030(a)(1) (2012), respectively.

government. This includes both physical intrusions into constitutionally protected spaces and non-physical intrusions made possible through the use of technology.[3]

On appeal, McKelvey argues that the warrantless aerial surveillance of his greenhouse using a telephoto lens was constitutionally impermissible. To address this claim, the key question we must answer is whether the aerial surveillance constituted a "search" for constitutional purposes. If it did, then the surveillance was presumptively unreasonable absent a search warrant.

Under both federal and state law, when a person claims that the government's invasion of their property constitutes a "search," courts must engage in a two-part analysis: Did the person manifest a subjective expectation of privacy in the property? And if so, is society willing to recognize that person's expectation of privacy as objectively reasonable?[4] If both prongs are met — *i.e.*, if the government's action intruded upon an individual's reasonable expectation of privacy — then the government's action constitutes a search for constitutional purposes, and it must be supported by a warrant or by a recognized exception to the warrant requirement.

The first part of this two-part inquiry — the subjective prong — is undisputed in this case. Courts have generally treated the erection of walls, fences, or gates, or the posting of signage, as manifesting an intent to protect a person's privacy in

---

[3]    *Cowles v. State*, 23 P.3d 1168, 1170 (Alaska 2001).

[4]    *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring), and *Smith v. Maryland*, 442 U.S. 735, 740 (1979)); *State v. Glass*, 583 P.2d 872, 875 (Alaska 1978) (citing *Smith v. State*, 510 P.2d 793, 797 (Alaska 1973)) (recognizing Alaska's adoption of the two-part expectation-of-privacy test first set forth in Justice Harlan's concurrence in *Katz*); *Pearce v. State*, 45 P.3d 679, 682 (Alaska App. 2002) (same).

the curtilage of their home.[5] Here, the superior court found that McKelvey's greenhouse was located a short distance (approximately ten to fifteen feet) behind his house, in an area "surrounded by a natural sight-barrier of tall woods." The court further found that the greenhouse could not be seen from the ground by anyone who approached McKelvey's front door by normal means, and who otherwise heeded the "No Trespassing" and "Keep Out" signs that were posted throughout the barrier to the property. Based on these facts, the court found that "McKelvey very obviously did not wish for passersby to view his greenhouse or its contents." The State does not contest this conclusion, and the record supports it.[6]

McKelvey's case therefore hinges on the second prong — the objective prong — of the test: Was it reasonable for McKelvey to expect that his greenhouse

---

[5]  *See Florida v. Riley*, 488 U.S. 445, 450 (1989) ("Riley no doubt intended and expected that his greenhouse would not be open to public inspection, and the precautions he took protected against ground-level observation."); *State v. Quiday*, 405 P.3d 552, 558 (Haw. 2017) ("Quiday's placement of the plants in his backyard, the activities in which were not capable of observation by members of the public at ground-level, was 'indicative of [his] subjective intent to avoid the public gaze' into the curtilage of his home." (alteration in original) (quoting *State v. Kaaheena*, 575 P.2d 462, 467 (Haw. 1978))); *State v. Davis*, 627 P.2d 492, 494 (Or. App. 1981) ("[D]efendant did display to some extent a subjective expectation of privacy, evidenced by the posting of 'no trespassing' signs and the use of a locked gate across the driveway to the secluded property."); *State v. Bryant*, 950 A.2d 467, 473 (Vt. 2008) ("Fences, gates, and no-trespassing signs generally suffice to apprise a person that the area is private." (citation omitted)); *see also State v. Davis*, 360 P.3d 1161, 1180 (N.M. 2015) (Chávez, J., concurring) ("If an individual has taken steps to ward off inspection *from the ground*, the individual has also manifested an expectation that the visibility of his or her property that he or she sought to block off from the ground *should also be private when seen from the air*. This is because members of the general public generally do not intently scrutinize other peoples' curtilages, even when they do fly over private property." (emphasis in original) (citing *Riley*, 488 U.S. at 460) (Brennan, J., dissenting)).

[6]  *See Pearce*, 45 P.3d at 682-83 (reviewing the trial court's finding that the defendant lacked a subjective expectation of privacy for clear error).

would not be subjected to aerial surveillance that was enhanced by image-magnifying technology?

McKelvey argues that both the federal and state constitutions support the conclusion that his expectation of privacy from this type of police surveillance was reasonable. But the United States Supreme Court has twice rejected Fourth Amendment challenges to warrantless aerial observation of the curtilage of a home when the curtilage was open to observation from the air, even though the homeowner had taken steps to block ground-level observation of the property. Although neither of these cases involved observations that were enhanced by technological means, and even though the Supreme Court has never directly addressed the use of a telephoto lens to surveil the curtilage of a home, the Supreme Court's case law in this area gives little reason to believe that the Fourth Amendment would protect McKelvey from the type of surveillance that occurred in this case.

We need not resolve this issue of federal law, however, because we conclude that, given Alaska's explicit constitutional protection of privacy, as well as Alaska law's heightened protection for the privacy of residences, McKelvey could reasonably expect that his home and backyard would not be subjected to the type of aerial surveillance that occurred in this case.

We therefore rely solely on the Alaska Constitution to decide McKelvey's case. However, it is useful, in the first instance, to examine the major federal cases addressing this question — in order to explain why we find these cases insufficiently protective of Alaskans' right to privacy.

*Why we conclude that McKelvey would be unlikely to prevail on his claim*
*under federal law pertaining to aerial surveillance by law enforcement*

The United States Supreme Court first considered the constitutionality of warrantless aerial surveillance by law enforcement in *California v. Ciraolo*.[7] In *Ciraolo*, as in McKelvey's case, the police received a tip that the defendant was growing marijuana in his backyard. Because two fences completely enclosed Ciraolo's yard, rendering ground-level observation impossible, the police attempted to corroborate the informant's tip by flying a plane over Ciraolo's house at an altitude of 1,000 feet. From the air, the police identified marijuana plants growing in Ciraolo's yard, and they photographed these plants using a standard 35mm camera lens.[8] Based on this evidence, the police obtained a search warrant to seize the marijuana plants.[9]

In a 5-to-4 decision, the Supreme Court concluded that this aerial surveillance did not constitute a search under the Fourth Amendment, and that therefore no warrant was required.[10]

To determine whether this surveillance constituted a search, the Court applied the two-part "reasonable expectation of privacy" test.[11] The Court ultimately concluded that Ciraolo's expectation of privacy from aerial surveillance was not reasonable.[12]

---

[7]   *California v. Ciraolo*, 476 U.S. 207 (1986).

[8]   *Id.* at 209.

[9]   *Id.* at 209-10.

[10]   *Id.* at 214-15.

[11]   *Id.* at 211 (citing *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring), and *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

[12]   *Id.* at 214.

In reaching this conclusion, the Court acknowledged that Ciraolo's yard was within the curtilage of his home[13] — *i.e.*, "the land immediately surrounding and associated with the home" in which a resident retains a reasonable expectation of privacy.[14] As the Court explained, "[t]he protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened."[15]

But the Court noted that the federal constitution does not prohibit police observation of an area simply because that area is within the curtilage, if the police make the observation from a place where they are entitled to be. The Court likened the sky to a "public thoroughfare," and declared that "the mere fact that an individual has taken measures to restrict *some* views of his activities [does not] preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible."[16]

The Court noted that the aerial observations by the police officers in Ciraolo's case were made "within public navigable airspace in a physically nonintrusive manner," and that these observations revealed "plants readily discernible to the naked eye as marijuana."[17] Given the fact that "[a]ny member of the public flying in this airspace who glanced down could have seen everything that these officers observed," the

---

[13] *Id.* at 212-13.

[14] *Oliver v. United States*, 466 U.S. 170, 180 (1984); *see also Kelley v. State*, 347 P.3d 1012, 1014-15 (Alaska App. 2015) (recognizing that the protection against unreasonable searches "extends to the curtilage of the home — those areas immediately surrounding the home in which the resident retains a reasonable expectation of privacy").

[15] *Ciraolo*, 476 U.S. at 212-13.

[16] *Id.* at 213 (emphasis added) (citation omitted).

[17] *Id.*

Court concluded that any expectation that Ciraolo's yard would be protected from aerial observation was unreasonable.[18] Accordingly, the Court held that no search had occurred, and thus no warrant was required.[19]

Justice Powell, joined by three other members of the Court, dissented from this holding. The dissenters argued that, under normal circumstances, "the actual risk to privacy from commercial or pleasure aircraft is virtually nonexistent [because] [t]ravelers on commercial flights, as well as private planes used for business or personal reasons, normally obtain at most a fleeting, anonymous, and nondiscriminating glimpse of the landscape and buildings over which they pass."[20] Thus, according to the dissenters, "[t]he risk that a passenger on such a plane might observe private activities, and might connect those activities with particular people, is simply too trivial [for a homeowner] to protect against."[21] In contrast, in Ciraolo's case, the "police conducted an overflight at low altitude solely for the purpose of discovering evidence of crime within a private enclave into which they were constitutionally forbidden to intrude at ground level without a warrant."[22] For these reasons, the dissenters concluded, Ciraolo's expectation of privacy was reasonable, and the warrantless aerial surveillance of his yard constituted a search.[23]

---

[18] *Id.* at 213-14.

[19] *Id.* at 214-15.

[20] *Ciraolo*, 476 U.S. at 223 (Powell, J., dissenting).

[21] *Id.* at 223-24.

[22] *Id.* at 224-25.

[23] *Id.* at 225.

The result in *Ciraolo* — if not its rationale — was reaffirmed three years later when the Court decided *Florida v. Riley*.[24] Riley lived in a mobile home on five acres of rural property, and a partially enclosed greenhouse was located ten to twenty feet behind his mobile home. The police received a tip that Riley was growing marijuana on his property. When an investigating officer was unable to see the contents of Riley's greenhouse from the road, the officer flew over Riley's property — this time, in a helicopter at a height of only 400 feet. With his naked eye, the officer was able to see what he believed to be marijuana growing in the greenhouse.[25] The officer obtained a search warrant based on these observations, and the subsequent search uncovered marijuana growing in the greenhouse.[26]

Riley argued that the helicopter flight over his property was an illegal warrantless search that violated the Fourth Amendment. In a divided decision with no majority opinion, the Supreme Court rejected this argument.[27] A four-member plurality concluded that Riley's case was controlled by *Ciraolo*.[28] The plurality noted that the helicopter was being lawfully operated within the Federal Aviation Administration's (FAA) altitude restrictions for helicopters, and that therefore "[a]ny member of the public could legally have been flying over Riley's property [in the same manner as the police officer] and could have observed Riley's greenhouse."[29]

---

[24] *Florida v. Riley*, 488 U.S. 445 (1989).

[25] *Id.* at 448.

[26] *Id.* at 448-49.

[27] *Id.* at 449-52.

[28] *Id.* at 449.

[29] *Id.* at 451. Helicopters are generally permitted to fly at any altitude "[i]f the operation

(continued...)

The plurality declined to say "[whether] an inspection of the curtilage of a house from an aircraft will always pass muster under the Fourth Amendment simply because the plane is within the navigable airspace specified by law."[30]  However, the plurality noted that there was "nothing in the record . . . to suggest that helicopters flying at 400 feet are sufficiently rare in this country to lend substance to [Riley's] claim that he reasonably anticipated that his greenhouse would not be subject to observation from that altitude."[31]  There was similarly no suggestion that the helicopter interfered with Riley's use of his greenhouse or other parts of his curtilage.[32]

Justice O'Connor concurred in the Court's resolution of the case, but she wrote separately to explain her different rationale for reaching this result.  In her view, "the plurality's approach rest[ed] the scope of Fourth Amendment protection too heavily on compliance with FAA regulations whose purpose is to promote air safety, not to protect [Fourth Amendment rights]."[33]  According to Justice O'Connor, the question was "not whether the helicopter was where it had a right to be under FAA regulations," but rather "whether the helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity that Riley's expectation of privacy from aerial observation was not 'one that society is prepared to recognize as "reasonable." ' "[34]

---

[29]  (...continued)
[of the helicopter] is conducted without hazard to persons or property on the surface."  14 C.F.R. § 91.119(d).

[30]  *Riley*, 488 U.S. at 451.

[31]  *Id.* at 451-52.

[32]  *Id.* at 452.

[33]  *Id.* (O'Connor, J., concurring).

[34]  *Id.* at 454 (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., (continued...)

Justice O'Connor then concluded that Riley had the burden of proving that his expectation of privacy was reasonable — *i.e.*, that public use of airspace at altitudes of 400 feet was rare.[35] Because Riley did not present any evidence on this point, Justice O'Connor agreed with the plurality that he had failed to show that his Fourth Amendment rights were violated.[36]

Justice Brennan, in a dissenting opinion joined by Justices Marshall and Stevens, criticized the plurality for "undertak[ing] no inquiry into whether low-level helicopter surveillance by the police of activities in an enclosed backyard is consistent with the 'aims of a free and open society,'" and instead relying on the fact that any member of the public could have observed Riley's greenhouse from the air.[37] These dissenting justices, plus Justice Blackmun in a separate dissent,[38] agreed with Justice O'Connor that "the fundamental inquiry is not whether the police were where they had a right to be under FAA regulations, but rather whether Riley's expectation of privacy was rendered illusory by the extent of public observation of his backyard from aerial traffic at 400 feet."[39] But they diverged from Justice O'Connor on the question of which party bore the burden of proof on this issue.[40]

---

[34]   (...continued)
concurring)).

[35]   *Id.* at 455.

[36]   *Id.*

[37]   *Riley*, 488 U.S. at 456-57 (Brennan, J., dissenting) (quoting Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 403 (1974)).

[38]   *Id.* at 467 (Blackmun, J., dissenting).

[39]   *Id.* at 464-65 (Brennan, J., dissenting).

[40]   *Id.* at 465-66 (Brennan, J., dissenting) ("Because the State has greater access to
(continued...)

Turning to the facts of McKelvey's case, there is no dispute that Trooper Moore was flying in airspace where he had a legal right to be under FAA regulations.[41] But to the extent that *Ciraolo* relies on the legality of the police overflight as the benchmark for assessing a person's reasonable expectation of privacy, the concurrence and the two dissents in *Riley* call this analysis into question. A majority of the *Riley* court (the four dissenters and the one concurring justice) agreed that the case turned, not on whether FAA regulations permitted an overflight at that altitude, but instead on whether the target of the surveillance could reasonably expect aerial privacy, given the frequency of air travel at the relevant altitude.[42]

Here, McKelvey testified that low-altitude flights were uncommon near his property, and that the trooper's flyover was notable. He testified that he heard the plane overhead, and he stepped outside to see the plane's tail end passing by, only to see it

---

[40] (...continued)
information concerning customary flight patterns and because the coercive power of the State ought not be brought to bear in cases in which it is unclear whether the prosecution is a product of an unconstitutional, warrantless search, ... the burden of proof properly rests with the State and not with the individual defendant." (internal citation omitted)); *Id.* at 468 (Blackmun, J., dissenting) (concluding that the State should bear the burden of proof "for any helicopter surveillance case in which the flight occurred below 1,000 feet — in other words, for any aerial surveillance case not governed by the Court's decision in *California v. Ciraolo*").

[41] *See* 14 C.F.R. § 91.119(b) & (c) (providing that a fixed-wing aircraft may not operate, over congested areas, below "an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet of the aircraft" and, over non-congested areas, below "[a]n altitude of 500 feet above the surface, except over open water or sparsely populated areas. In those cases, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.").

[42] *Riley*, 488 U.S. at 455 (O'Connor, J., concurring), 464-65 (Brennan, J., dissenting), & 467 (Blackmun, J., dissenting); *see* 1 Wayne R. LaFave, *Search and Seizure* § 2.1(d), at 592 (5th ed. 2012).

return several minutes later. McKelvey acknowledged that there was a private airstrip a mile away, but he said that the only air traffic he had ever observed was "several times higher" and that this flyover was "the first time [he had] ever seen a plane that low" or heard engine noise so loud over his house.

The superior court found McKelvey's testimony on this point unpersuasive, in light of the frequency of air travel in Alaska generally and the presence of an air strip a mile from McKelvey's property. But there was no specific evidence presented about the frequency of air travel at 600 feet in the vicinity of McKelvey's residence, or the frequency of flights from the nearby airstrip. Conceivably, the question of which party bears the burden of proof as to flight frequency could matter to McKelvey's claim under the federal constitution.

McKelvey does not brief this question. Instead, he focuses on a different distinction between his case and the facts of *Ciraolo* and *Riley*. Both *Ciraolo* and *Riley* involved naked-eye observations. In *Ciraolo*, the police documented their observations by taking photographs with a standard 35mm camera, but there was no claim that this camera enhanced the officers' view of the yard.[43] And in *Riley*, the police made observations without any technological assistance.[44] In McKelvey's case, by contrast, the police used a camera equipped with a magnifying lens.

This use of telephoto technology could potentially affect McKelvey's claim under the federal constitution. The final sentence of *Ciraolo*, for instance, states that "[t]he Fourth Amendment simply does not require the police traveling in the public airways at this altitude to obtain a warrant in order to observe what is visible *to the naked*

---

[43] *California v. Ciraolo*, 476 U.S. 207, 209, 212-13 (1986).

[44] *Riley*, 488 U.S. at 448 (plurality opinion).

*eye.*[45] Then, in a footnote, the Court pointed out that the State had acknowledged that "[a]erial observation of curtilage may become invasive, either due to physical intrusiveness or through modern technology which discloses to the senses those intimate associations, objects or activities otherwise imperceptible to police or fellow citizens."[46]

Relying on these statements from *Ciraolo*, McKelvey asserts that the telephoto lens used in his case allowed the trooper to observe things that were not otherwise visible to the naked eye, and he argues that this turned an otherwise permissible police surveillance into a search requiring a warrant.

But the language McKelvey relies on from *Ciraolo* indicates only that the police do not need a warrant to observe what is visible to the naked eye. This does not necessarily imply that, under the Fourth Amendment, the police *do* need a warrant if they intend to use commonly available technological enhancements to observe what is *not* visible to the naked eye.

McKelvey also relies on the Supreme Court's decision in *Kyllo v. United States*.[47] In *Kyllo*, the Court considered "whether the use of a thermal-imaging device aimed at a private home from a public street to detect relative amounts of heat within the home constitutes a 'search' within the meaning of the Fourth Amendment."[48] The Court held that "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical

---

[45] *Ciraolo*, 476 U.S. at 215 (emphasis added).

[46] *Id.* at 215 n.3 (alteration in original).

[47] *Kyllo v. United States*, 533 U.S. 27 (2001).

[48] *Id.* at 29.

intrusion into a constitutionally protected area constitutes a search — at least where . . . the technology in question is not in general public use."[49]

But this passage from *Kyllo* does not answer the question presented in McKelvey's case, since the trial court explicitly found that the type of telephoto lens used to view McKelvey's greenhouse was indeed in general public use, and McKelvey does not challenge this finding.

We therefore think it is unlikely that McKelvey would prevail under the Fourth Amendment. Perhaps the most that can be said is that the existing Supreme Court jurisprudence does not provide a definitive answer.

*Why we conclude that the Alaska Constitution requires a warrant for the type of aerial surveillance in this case*

As we noted earlier, Alaska has adopted the two-part reasonable-expectation-of-privacy test for determining whether a search has occurred for purposes of Article I, Section 14 of the Alaska Constitution.[50] Although this is seemingly the same test that the federal courts employ under the Fourth Amendment, the application of this test is somewhat different under Alaska law.

First, the Alaska Supreme Court has recognized that "the explicit protection of privacy set out in article I, section 22 of the Alaska Constitution necessarily . . . increases the likelihood that a person's expectation of privacy . . . can be deemed

---

[49]    *Id.* at 34 (citation and internal quotations omitted).

[50]    *See State v. Glass*, 583 P.2d 872, 875 (Alaska 1978) (citing *Smith v. State*, 510 P.2d 793, 797 (Alaska 1973)) (recognizing Alaska's adoption of the two-part expectation-of-privacy test set forth in Justice Harlan's concurrence in *Katz*); *Pearce v. State*, 45 P.3d 679, 682 (Alaska App. 2002) (same).

objectively reasonable."[51]  Thus, although we apply the same analytical framework as the federal courts to determine whether governmental scrutiny constitutes a search for constitutional purposes, Alaska law is more likely to recognize that an expectation of privacy is reasonable, given our express constitutional protection for the right of privacy.[52]

Second, Alaska courts have applied the reasonable-expectation-of-privacy test in a manner more consistent with its constitutional underpinnings, while commentators have criticized the United States Supreme Court's application of the two-part test as having become unmoored from its original purpose.

The Supreme Court's decisions in *Ciraolo* and *Riley* are paradigmatic of this problem.  In both of these decisions, the objective reasonableness of a person's expectation of privacy was treated as a question of fact rather than as a question of constitutional law, with members of the Court suggesting that the answer turned on whether "a single member of the public could conceivably position herself to see into the area in question without doing anything illegal."[53]

---

[51]  *Beltz v. State*, 221 P.3d 328, 334 (Alaska 2009).  Article I, section 22 of the Alaska Constitution provides in relevant part:  "The right of the people to privacy is recognized and shall not be infringed."

[52]  *See, e.g.*, *Beltz*, 221 P.3d at 332-35 (concluding, contrary to federal law, *California v. Greenwood*, 486 U.S. 35 (1988), that Alaskans have some reasonable expectation of privacy in garbage set out for routine collection on or adjacent to a public street); *see also State v. Gibson*, 267 P.3d 645, 659 (Alaska 2012) ("Alaska courts have used section 22's right to privacy to give section 14's protection against unreasonable searches and seizures 'a liberal interpretation.'" (quoting *Anchorage v. Ray*, 854 P.2d 740, 750 (Alaska App. 1993))).

[53]  *Florida v. Riley*, 488 U.S. 445, 457 (1989) (Brennan, J., dissenting).

Professor LaFave has criticized this approach in his treatise on the law of search and seizure:

> [W]hile "privacy may have been a promising theory of the Fourth Amendment at one time, it has now lost much of its luster and utility" because of two serious mistakes by the Court in post-*Katz* cases: the Court (1) "has interpreted privacy to be a question of fact rather than a constitutional value" and (2) is apparently "out of touch with society's true expectations of privacy."[54]

In contrast, Professor LaFave suggests that the question of whether the second prong of the reasonable expectation test is satisfied under a particular set of facts should be viewed as an issue of law, and that the answer entails "a value judgment": The "ultimate question" is "whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a [scope] inconsistent with the aims of a free and open society."[55]

The Alaska Supreme Court has expressly adopted this value-based, question-of-law approach endorsed by Professor LaFave.[56] Thus, Alaska law gives a broader reading to the second prong of the reasonable expectation test.

With this legal background, we now turn to the question presented in this case: If our state constitution does not regulate the type of technologically enhanced aerial government surveillance of a person's residential curtilage that occurred in this

---

[54] 1 Wayne R. LaFave, *Search and Seizure* § 2.1(d), at 590-92 (5th ed. 2012) (quoting Erik G. Luna, *Sovereignty and Suspicion*, 48 Duke L.J. 787, 825, 827 (1999)).

[55] *Id.* § 2.1(d), at 590 (quoting Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 403 (1974)).

[56] *Cowles v. State*, 23 P.3d 1168, 1171 (Alaska 2001).

case, would the amount of privacy remaining to Alaska citizens be diminished to an extent inconsistent with the aims of a free and open society?

We start with the foundational principle that the right to privacy is at its pinnacle when the government's conduct implicates Alaskans' right to be left undisturbed in their homes. As the Alaska Supreme Court said in 1975 in *Ravin v. State*, "If there is any area of human activity to which a right to privacy pertains more than any other, it is the home."[57] The supreme court continued:

> The privacy amendment to the Alaska Constitution was intended to give recognition and protection to the home. Such a reading is consonant with the character of life in Alaska. Our . . . state has traditionally been the home of people who prize their individuality and who have chosen to settle or to continue living here in order to achieve a measure of control over their own lifestyles which is now virtually unattainable in many of our sister states.[58]

The area immediately surrounding and associated with the home — the "curtilage" of a person's home — merits the same heightened constitutional protection.[59] This is the area "to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life."[60]

---

[57]   *Ravin v. State*, 537 P.2d 494, 503 (Alaska 1975).

[58]   *Id.* at 503-04.

[59]   *See Oliver v. United States*, 466 U.S. 170, 180 (1984); *Hakala v. Atxam Corp.*, 753 P.2d 1144, 1149 n.8 (Alaska 1988); *Kelley v. State*, 347 P.3d 1012, 1013-14 (Alaska App. 2015); *see also State v. Bryant*, 950 A.2d 467, 473 (Vt. 2008) ("A home's curtilage—the area outside the physical confines of a house into which the privacies of life may extend—merits the same constitutional protection from unreasonable searches and seizures as the home itself." (citations and internal quotation marks omitted)).

[60]   *Oliver*, 466 U.S. at 180 (citation and internal quotations omitted). The Supreme Court
(continued...)

The mere fact that a police aircraft is operated in compliance with FAA regulations is not a suitable standard for assessing whether the police have violated a person's reasonable expectation of privacy in their residential curtilage.[61] FAA regulations are primarily designed to ensure air safety, not protect privacy.[62] And even if these regulations were in part designed to protect privacy, we would still have an independent duty to ensure that those protections were no less than those guaranteed by the Alaska Constitution.

Moreover, as the *Ciraolo* dissenters noted, there is a qualitative difference between the observations that a pilot, crew member, or passenger might make during typical air travel and the observations that a police officer might make when engaged in "an overflight at low altitude solely for the purpose of discovering evidence of crime within a private enclave into which they were constitutionally forbidden to intrude at

---

[60] (...continued)
has defined the curtilage by reference to four factors: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987) (citations omitted).

[61] *Bryant*, 950 A.2d at 478 (recognizing that simply "abiding by the law in occupying a particular spot in the public airspace" is not "an adequate test of whether government surveillance from that same spot is constitutional"); *see also Florida v. Riley*, 488 U.S. 445, 453 (1989) (O'Connor, J., concurring) ("[T]here is no reason to assume that compliance with FAA regulations alone determines whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." (citation and internal quotations omitted)); *State v. Davis*, 360 P.3d 1161, 1182 (N.M. 2015) (Chávez, J., concurring) (declining to rely on an aircraft's altitude to evaluate the constitutionality of government aerial surveillance).

[62] *See Riley*, 488 U.S. at 452 (O'Connor, J., concurring) (recognizing that the purpose of FAA regulations is to promote air safety, not to protect Fourth Amendment rights).

– 21 –                                                                                    2675

ground level without a warrant."[63]  The views afforded by commercial and private flights are normally "fleeting, anonymous, and nondiscriminating," and the "risk that [someone on the] plane might observe private activities, and might connect those activities with particular people, is simply too trivial to protect against."[64]  Thus, a person's failure to completely hide their curtilage from aerial observation should not defeat their expectation of privacy.[65]

Ultimately, we agree with the Vermont Supreme Court that there is a fundamental flaw in the United States Supreme Court's approach to aerial surveillance

---

[63]  *California v. Ciraolo*, 476 U.S. 207, 224-25 (1986) (Powell, J., dissenting).  We acknowledge that, under Alaska constitutional law, the fact that a person's activities were "actually observed for the purpose of detecting misconduct does not affect the results of [our] analysis."  *Cowles v. State*, 23 P.3d 1168, 1173 (Alaska 2001).  There is a distinction, however, between purpose and conduct.  Although the dissenters in *Ciraolo* mentioned the law enforcement purpose of the surveillance, we view this as a means to explain how the police *conduct* — low-altitude surveillance targeted at a specific location — was qualitatively different, for the sake of determining whether Ciraolo had a reasonable expectation of privacy, from the conduct (*i.e.*, passing glimpses) of commercial air travelers.

[64]  *Ciraolo*, 476 U.S. at 223-24 (Powell, J., dissenting).

[65]  *See* 1 Wayne R. LaFave, *Search and Seizure* § 2.3(g), at 799-800 (5th ed. 2012) (citing *Ciraolo*, 476 U.S. at 223-24 (Powell, J., dissenting)); *see also State v. Quiday*, 405 P.3d 552, 562 (Haw. 2017) (holding warrantless overflights unconstitutional even though people "may unavoidably be exposed to casual glances from passing aircraft" (quoting *People v. Cook*, 710 P.2d 299, 304 (Cal. 1985)); Brian J. Sear, *Great Expectations of Privacy: A New Model for Fourth Amendment Protection*, 73 Minn. L. Rev. 583, 615-16 (1989) ("When government agents . . . have identified a backyard as belonging to a particular individual, and consciously glide, fly, or hover over that curtilage to monitor activities occurring there, those agents have intruded on privacy expectations to a far greater degree than those few uncaring members of the public to whom sunbathers have 'knowingly' exposed a quick glimpse of an unidentifiable person.").

in *Ciraolo*: it fails to take sufficient account of the heightened significance of the home and its curtilage as places of privacy under our state constitution.[66]

On appeal, the State acknowledges that the federal test developed by the United States Supreme Court fails to sufficiently protect Alaskans' privacy rights, and the State asks us to impose a more demanding test under the Alaska Constitution.

The State's proposed test would rest on several factors. The first two of these factors would be (1) whether the police overflight was conducted in accordance with FAA regulations, and (2) whether the overflight took place in a geographic area where overflights could be expected. However, the State acknowledges that these first two factors do not, by themselves, provide sufficient safeguards for privacy, "particularly in the case of aircraft such as helicopters and drones." Thus, the State proposes that we adopt — and place more emphasis on — two other elements: "the intrusiveness of the overflight," and whether the overflight "was conducted in a manner that did not violate reasonable expectations of privacy."

We agree in general with the proposition that aerial surveillance must not be conducted in a manner that violates a person's reasonable expectation of privacy. But we disagree with the State about what this concept means.

The State suggests that the aerial surveillance in McKelvey's case was minimally intrusive and that it did not violate any reasonable expectation of privacy that

---

[66] *See State v. Bryant*, 950 A.2d 467, 475 (Vt. 2008) ("[W]e find the Court's analysis in *Ciraolo* to lack the consideration for the significance of the home and its curtilage as 'repositor[ies] of heightened privacy expectations' that our [state constitutional] jurisprudence demands.") (quoting *State v. Geraw*, 795 A.2d 1219, 1221 (Vt. 2002)); *see also Ciraolo*, 476 U.S. at 219 (Powell, J., dissenting) (asserting that the majority's decision in *Ciraolo* was "curiously at odds" with its own reaffirmation of the curtilage doctrine, both in *Ciraolo* itself and in a second opinion issued that same day, *Dow Chemical Co. v. United States*, 476 U.S. 227, 235 (1986)).

McKelvey may have had.  Alternatively, the State suggests that the aerial surveillance only violated McKelvey's reasonable expectation of privacy to a slight degree — a degree that might require the surveillance to be supported by reasonable suspicion, but that would not require a search warrant based on probable cause.[67]

But we disagree with the State's proposed analysis in two major respects, and we conclude that the State's proposed test fails to adequately protect Alaskans' heightened expectation of privacy in their homes.

First, under the State's proposed test, it appears that, in most instances, police aerial surveillance would only constitute a search if it affirmatively caused a disturbance or created a risk of harm to persons or property on the ground.  This approach has characterized the analyses of many state courts,[68] but we conclude that this

---

[67]  *See Beltz v. State*, 221 P.3d 328 (Alaska 2009) (requiring the police to have reasonable suspicion before they search through garbage that the owner has set out for collection).

[68]  *See, e.g.*, *People v. Pollack*, 796 P.2d 63, 64-65 (Colo. App. 1990) (holding that defendant had a reasonable expectation of privacy from helicopter surveillance because of (1) "the infrequency of helicopter flights at 200 feet," and (2) "the excessive noise created by the helicopter as it circled the area"); *Davis*, 360 P.3d at 1171-72 (holding that warrantless aerial surveillance of the defendant's greenhouse amounted to an unconstitutional search, given the "prolonged hovering" by the helicopter "close enough to the ground to cause interference" with Davis's property:  "[W]hen low-flying aerial activity leads to more than just observation and actually causes an unreasonable intrusion on the ground . . . then at some point courts are compelled to step in and require a warrant before law enforcement engages in such activity."); *Commonwealth v. Oglialoro*, 579 A.2d 1288, 1292-94 (Pa. 1990) (holding that, in general, FAA regulations provide a useful reference in determining legality of aerial surveillance, but concluding that helicopter's presence at 50 feet for 15 seconds created a risk of harm and was therefore impermissible); *State v. Wilson*, 988 P.2d 463, 465 (Wash. App. 1999) ("Aerial surveillance is not a search where the contraband is identifiable with the unaided eye, from a lawful vantage point, and from a nonintrusive altitude.  But aerial surveillance may be intrusive and require a warrant if the vantage point is unlawful or the method of viewing is intrusive." (internal citations omitted)).

approach is flawed.

The primary purpose of Alaska's constitutional guarantee against unreasonable searches and seizures is to protect "personal privacy and dignity against unwarranted intrusion by the State."[69] The amount of noise, wind, and dust created by a police overflight is not an appropriate measure of whether the overflight infringed on these protections.

In his dissent in *Riley*, Justice Brennan specifically took issue with the plurality's reliance on the fact that the helicopter surveillance created "no undue noise, and no wind, dust, or threat of injury."[70] Justice Brennan responded to this argument with a prescient hypothetical:

> Imagine a helicopter capable of hovering just above an enclosed courtyard or patio without generating any noise, wind, or dust at all — and, for good measure, without posing any threat of injury. Suppose the police employed this miraculous tool to discover not only what crops people were growing in their greenhouses, but also what books they were reading and who their dinner guests were. Suppose, finally, that the FAA regulations remained unchanged, so that the police were undeniably "where they had a right to be." Would today's plurality continue to assert that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" was not infringed by such surveillance? Yet that is the logical consequence of the plurality's rule that, so long as the police are where they have a right to be under air traffic regulations, the Fourth Amendment is offended only if the aerial surveillance interferes with the use of the backyard as a

---

[69] *Weltz v. State*, 431 P.2d 502, 506 (Alaska 1967) (quoting *Schmerber v. California*, 384 U.S. 757, 767 (1966)).

[70] *Riley*, 488 U.S. at 461 (Brennan, J., dissenting) (quoting the plurality opinion).

garden spot. Nor is there anything in the plurality's opinion to suggest that any different rule would apply were the police looking from their helicopter, not into the open curtilage, but through an open window into a room viewable only from the air.[71]

Three decades ago, Justice Brennan might properly call such technology "miraculous." But today we would call it commonplace. Remote-controlled drones and lightweight, high-resolution video cameras are readily available to the public and the police alike. We agree with Justice Brennan that, in light of this technology, an approach that focuses on the amount of disruption or disturbance caused by the police surveillance is fundamentally inadequate to protect the rights guaranteed to Alaska's citizens by our constitution.[72]

This brings us to our second area of disagreement with the State's analysis. We reject the State's assertion that the police aerial surveillance in this case constituted, at most, a minor infringement of McKelvey's reasonable expectation of privacy.

At least two high courts — the California Supreme Court and the Hawaii Supreme Court — have held that an individual has a reasonable expectation of privacy from governmental aerial surveillance of their house and residential curtilage if the aerial surveillance is conducted for the purpose of detecting criminal activity.[73] Both of these courts acknowledged that a person's yard "may unavoidably be exposed to casual

---

[71]  *Id.* at 462-63.

[72]  The Alaska Legislature, acting upon these same privacy concerns, recently passed a law regulating the use of unmanned aircraft systems (*i.e.*, drones) in criminal investigations. AS 18.65.902; SLA 2014, ch. 105, § 2. The legislature's concern about the protection of privacy in the face of advancing technology underscores the importance of adhering to Alaska's strong preference for warrants under these circumstances.

[73]  *People v. Cook*, 710 P.2d 299, 305-08 (Cal. 1985); *State v. Quiday*, 405 P.3d 552, 562 (Haw. 2017).

glances from passing aircraft," but these courts concluded that residents should be able to "reasonably assume" that their curtilage will "not be intently examined by government agents who are flying over it for the specific purpose of detecting criminal activity therein."[74] As the California Supreme Court stated in *Cook*:

> A society where individuals are required to erect opaque cocoons within which to carry on any affairs they wish to conduct in private, and the concomitant chill such a requirement would place on lawful outdoor activity, would be inimical to the vision of legitimate privacy which underlies our state Constitution.[75]

Accordingly, both the California and the Hawaii supreme courts have held that government aerial surveillance of an individual's residence and curtilage, conducted for the purpose of criminal investigation, qualifies as a "search" under their respective state constitutions and requires a search warrant (unless there is an applicable exception to the warrant requirement).[76]

This approach to police overflights finds strong support in Alaska law: Article I, Section 22 of the Alaska Constitution expressly guarantees a right of privacy;

---

[74]   *Quiday*, 405 P.3d at 562 (quoting *Cook*, 710 P.2d at 304).

[75]   *Cook*, 710 P.2d at 302.

[76]   The California Supreme Court's decision in *Cook* predated the United States Supreme Court's decision in *Ciraolo*, but the California Supreme Court reaffirmed the holding of *Cook* in a post-*Ciraolo* decision.  *See People v. Mayoff*, 729 P.2d 166, 171-72 (Cal. 1986). Although the state constitutional ruling in *Cook* remains valid law, California residents later voted to amend the California Constitution to eliminate the application of the exclusionary rule to relevant evidence gathered in violation of the California Constitution.  *See* Cal. Const. art I, § 28(f)(2); *see Mayoff*, 729 P.2d at 178 (Lucas, J., concurring) ("Only because this case and *Cook* arose *prior* to the adoption of Proposition 8 must we consider whether the searches conducted in those cases violated state constitutional requirements." (emphasis in original)); Diana Friedland, *27 Years of "Truth-in-Evidence": The Expectations and Consequences of Proposition 8's Most Controversial Provision*, 14 Berkeley J. Crim. L. 1 (2009).

Alaska law has a strong preference for requiring a warrant before the police conduct searches of people's residences;[77] and the Alaska Supreme Court has adopted the "value judgment," question-of-law approach to the second prong of the reasonable expectation test.[78]

Moreover, it is easy to see why Alaskans' sense of security might be severely compromised if our constitution did not regulate purposeful aerial surveillance of people's houses by law enforcement officers. "[E]ven individuals who have taken effective precautions to ensure against ground-level observations cannot block off all conceivable aerial views of their outdoor patios and yards without entirely giving up their enjoyment of those areas."[79] And a person's right to privacy should not hinge on whether that person has the financial means to undertake the extraordinary measures that would be required to shield their curtilage from all aerial view.[80]

But we need not decide whether to adopt the same broad rule adopted in California and Hawaii because, in McKelvey's case, there is one more factor to consider: Trooper Moore did not make his observations of McKelvey's backyard and greenhouse with his unaided naked eye; rather, he used a telephoto lens to enhance his view of the contents of the greenhouse. And as we explained earlier, when Moore testified at the

---

[77] *See State v. Jones*, 706 P.2d 317, 323 (Alaska 1985); *Reeves v. State*, 599 P.2d 727, 735 (Alaska 1979).

[78] *Cowles v. State*, 23 P.3d 1168, 1171 (Alaska 2001).

[79] *State v. Davis*, 360 P.3d 1161, 1181 (N.M. 2015) (Chávez, J., concurring) (emphasis removed) (quoting *Florida v. Riley*, 488 U.S. 445, 454 (1989) (O'Connor, J., concurring)).

[80] *Id.* at 1182; *see also Cook*, 710 P.2d at 305; 1 Wayne R. LaFave, *Search and Seizure* § 2.6(c), at 898-99 (5th ed. 2012) ("It would be a perversion of *Katz* to interpret it as extending protection only to those who resort to extraordinary means to keep information regarding their personal lives out of the hands of the police.").

evidentiary hearing in the superior court, he acknowledged that he was only able to see the buckets in the greenhouse by using this telephoto lens. Thus, this technological enhancement of Moore's vision was a significant factor in his ability to observe McKelvey's property.

We acknowledge that many courts have concluded that a police officer's use of a commercially available camera — even one with a telephoto lens — does not convert an otherwise permissible police observation into a "search."[81] But we conclude that commercial availability should not be the determinative factor when analyzing whether a particular form of technology transforms state action into a search. Rather, an officer's use of vision-enhancing technology should be deemed a "search" if the technology allows the officer to make observations that are significantly more detailed than what an unaided human eye would be able to see at the same distance.

While we agree with the State that the telephoto lens used in this case did not reveal the same level of detail that a person could discern if they were physically present on the property, the lens did reveal a critical detail that Moore was apparently

---

[81] *See, e.g.*, *Sundheim v. Bd. of Cty. Comm'rs*, 904 P.2d 1337, 1351 (Colo. App. 1995); *State v. Vogel*, 428 N.W.2d 272, 275 (S.D. 1988); *State v. Lange*, 463 N.W.2d 390, 394-95 (Wis. App. 1990). Other cases that have upheld aerial surveillance have specified that the surveillance was done without technological enhancement, without deciding whether the use of technological enhancement would have altered the outcome. *See, e.g.*, *State v. Rodal*, 985 P.2d 863, 866 (Or. App. 1999) (finding it unnecessary to decide whether use of a telephoto lens during aerial surveillance of defendant's yard was sufficiently intrusive so as to violate protected privacy interests because the trial court found that the police "positively identified the marijuana plants on defendant's property with no visual aids other than his eyeglasses *before* using the telephoto lens to document his discovery" (emphasis in original)); *State v. Wilson*, 988 P.2d 463, 465 (Wash. App. 1999) ("Aerial surveillance is not a search where the contraband is identifiable with the unaided eye, from a lawful vantage point, and from a nonintrusive altitude. But aerial surveillance may be intrusive and require a warrant if the vantage point is unlawful or the method of viewing is intrusive." (internal citations omitted)).

unable to discern with his naked eye — the existence of the five-gallon buckets in the greenhouse.[82] McKelvey could reasonably expect that, in the absence of a warrant, the police would not invade the airspace above his residential property and view his intimate activities using such a lens.[83]

Both the Alaska Supreme Court and this Court have repeatedly interpreted Article I, Section 14 of the Alaska Constitution to provide greater protection to Alaskans

---

[82] The State attached to its brief a sample series of nine photographs (unconnected to this case), each displaying a view from an increasing focal length, from 18mm to 300mm. These photographs (obtained from the Nikon website) show that the difference in detail between 35mm and 200-300mm is significant. *See* Diane Berkenfeld et al., *Understanding Focal Length*, Nikon, https://www.nikonusa.com/en/learn-and-explore/a/tips-and-techniques/understanding-focal-length.html (photographs by Dave Black) (last visited Aug. 31, 2020).

[83] *See State v. Knight*, 621 P.2d 370, 373-74 (Haw. 1980) (holding that the police's use of binoculars to view the contents of the defendant's greenhouse was constitutionally impermissible where the property was located in a remote area, and the greenhouse was surrounded by vegetation and covered by materials that made it impossible for the naked eye to view the contents); *Commonwealth v. Lemanski*, 529 A.2d 1085, 1092-93 (Pa. Super. Ct. 1987) (holding that the police violated the defendant's reasonable expectation of privacy when they found an opening in the shrubbery outside the defendant's rural home, and used binoculars and a telephoto lens to peer into a greenhouse attached to the home); *Wheeler v. State*, 659 S.W.2d 381, 390 (Tex. Crim. App. 1982) (holding that the use of a 600mm telescope to peer through five-inch louvered opening in opaque greenhouse from a neighboring property about 100 yards away constituted a search where defendant lived in remote, rural area and police made "concerted effort to view what had tenaciously been protected as private"); *cf. United States v. Taborda*, 635 F.2d 131, 139 (2d Cir. 1980) ("We conclude that observation of objects and activities inside a person's home by unenhanced vision from a location where the observer may properly be does not impair a legitimate expectation of privacy. However, any enhanced viewing of the interior of a home does impair a legitimate expectation of privacy and encounters the Fourth Amendment's warrant requirement, unless circumstances create a traditional exception to that requirement."). *But see State v. Citta*, 625 A.2d 1162, 1163 (N.J. Super. Ct. 1990) ("Is the warrantless use of binoculars by a police officer to observe objects not visible to the naked eye an unreasonable search under the Fourth Amendment to the U.S. Constitution? We hold it is not.").

– 30 – 2675

than the corresponding provisions of the Fourth Amendment.[84]  As we explained in *Brown v. State*, Alaska courts have given a broader interpretation to our state's search and seizure clause "when we were convinced that the United States Supreme Court's interpretation of the Fourth Amendment 'fails to adequately safeguard our citizens' right to privacy, . . . fails to adequately protect citizens from unwarranted government intrusion, and . . . unjustifiably reduces the incentive of police officers to honor citizens' constitutional rights.'"[85]  This is one of those situations.

Accordingly, we now hold that when an individual has taken reasonable steps to protect their house and curtilage from ground-level observation, that individual has a reasonable expectation that law enforcement officers will not use a telephoto lens or other visual enhancement technology to engage in aerial surveillance of the

---

[84]  *Brown v. State*, 182 P.3d 624, 633 & n.13 (Alaska App. 2008) (collecting cases); *see, e.g.*, *Beltz v. State*, 221 P.3d 328, 332-35 (Alaska 2009) (concluding, contrary to federal law, that Alaskans have some reasonable expectation of privacy in garbage set out for routine collection on or adjacent to a public street); *State v. Daniel*, 589 P.2d 408, 417 (Alaska 1979) (holding that while the police may, upon impounding a vehicle, conduct an inventory to catalog all articles of value in the vehicle, "a warrantless inventory search of [any] closed, locked or sealed luggage, containers, or packages contained within a vehicle is unreasonable and thus an unconstitutional search" under Article I, Section 14 of the Alaska Constitution); *State v. Glass*, 583 P.2d 872, 879 (Alaska 1978) (holding that "Alaska's privacy amendment prohibits the secret electronic monitoring of conversations upon the mere consent of a participant"); *Zehrung v. State*, 569 P.2d 189, 199-200 (Alaska 1977) (concluding that, in contrast to federal law, "a warrantless search incident to an arrest, other than for weapons, is unreasonable and therefore violative of the Alaska Constitution if the charge on which the arrest is made is not one [for which] evidence . . . could be concealed on the person"), *modified on reh'g*, 573 P.2d 858 (Alaska 1978); *Joseph v. State*, 145 P.3d 595, 596, 605 (Alaska App. 2006) (refusing to follow *California v. Hodari D.*, 499 U.S. 621 (1991), where the Supreme Court held that the exclusionary rule does not apply to evidence obtained by police "while a person is fleeing from an impending unlawful detention").

[85]  *Brown*, 182 P.3d at 633 (alterations in original) (quoting *Joseph*, 145 P.3d at 605).

individual's residential property for the purpose of investigating criminal activity. In such circumstances, the aerial surveillance constitutes a "search" for purposes of Article I, Section 14 of the Alaska Constitution, and it requires a warrant unless there is an applicable exception to the warrant requirement.

Because McKelvey had taken reasonable measures to protect the privacy of his residential curtilage from ground-level observation, and because Trooper Moore used a telephoto lens during his aerial surveillance of McKelvey's property to obtain an enhanced view of the greenhouse located within McKelvey's curtilage, the trooper's investigative overflight was a search that required a warrant. Here, there was no warrant, and there was no applicable exception to the warrant requirement. Thus, the superior court should have granted McKelvey's motion to suppress.

*Conclusion*

The judgment of the superior court is REVERSED.