*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, | ) | |
| | ) | Supreme Court No. S-17910 |
| Petitioner, | ) | Court of Appeals No. A-12419 |
| | ) | |
| v. | ) | Superior Court No. 4FA-14-00040 CR |
| | ) | |
| JOHN WILLIAM MCKELVEY III, | ) | O P I N I O N |
| | ) | |
| Respondent. | ) | No. 7690 – March 9, 2024 |
| | ) | |

Petition for Hearing from the Court of Appeals of the State of Alaska, on appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Bethany Harbison, Judge.

Appearances: Michal Stryszak, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Petitioner. Robert John, Law Office of Robert John, Fairbanks, for Respondent. Renee McFarland, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Amicus Curiae Alaska Public Defender Agency.

Before: Winfree, Chief Justice, and Maassen, Carney, Borghesan, and Henderson, Justices.

BORGHESAN, Justice.
MAASSEN, Justice, with whom CARNEY, Justice, joins, concurring.

## I.    INTRODUCTION

Do the police have to get a warrant before taking pictures of your yard with a zoom lens while flying in an airplane?  The State argues that because small airplane travel is so common in Alaska, and because any passenger might peer into your yard and snap a picture of you, law enforcement officials may do the same.  We disagree.  The Alaska Constitution protects the right to be free of unreasonable searches.  The fact that a random person might catch a glimpse of your yard while flying from one place to another does not make it reasonable for law enforcement officials to take to the skies and train high-powered optics on the private space right outside your home without a warrant.  Unregulated aerial surveillance of the home with high-powered optics is the kind of police practice that is "inconsistent with the aims of a free and open society."[1]  The Alaska Constitution does not allow it.

## II.    FACTS AND PROCEEDINGS[2]

### A.    Facts

When this case began in 2012, John William McKelvey III lived on a property in a sparsely populated area just north of Fairbanks.  The property was heavily wooded, with a single driveway leading to a clearing.  In the clearing was a house and a translucent greenhouse.  Surrounding trees blocked ground-level view of the house and greenhouse from outside the clearing.  A gate blocked cars from entering the driveway, and numerous signs warned potential visitors that they were not welcome.

The Alaska State Troopers received a tip from a confidential informant that McKelvey was growing marijuana on the property.  The informant described seeing

---

[1]    *Cowles v. State*, 23 P.3d 1168, 1171 (Alaska 2001).

[2]    The oral argument in this case took place before an audience of students and teachers at Lathrop High School in Fairbanks as part of the "Supreme Court Live" community outreach program.

around thirty marijuana plants in five-gallon buckets and claimed that McKelvey took the plants into the greenhouse at night.

To confirm the informant's report, two troopers flew past McKelvey's property in an airplane. The troopers flew in a straight line past McKelvey's residence — at their closest point the troopers were roughly a quarter mile to a half mile south of the house at an altitude of roughly 600 feet. The troopers photographed the property using a camera with a high-powered zoom lens, which allowed them to magnify the image roughly nine times compared to the naked eye. The photographs revealed five-gallon buckets containing unidentifiable plants inside the greenhouse.

Based on the tip and observations from the flight, the troopers obtained a search warrant for McKelvey's house and property. Upon searching the house officers found marijuana plants, methamphetamine, scales, plastic bags for packaging, a loaded AK-47 rifle, and a large amount of cash. McKelvey was charged with criminal offenses based upon the evidence discovered during the search.

### B. Superior Court Proceedings

McKelvey moved to suppress this evidence. He argued that the information supporting the search warrant came from an illegal search: the warrantless observation of his home with a telephoto lens during a flight.

The superior court held an evidentiary hearing. The troopers who flew over McKelvey's property testified about their flight and observations. McKelvey also testified, describing his property and his observations of the troopers' flight. He stated that the flight was unusual. First, while there was an airstrip roughly a mile from his residence, McKelvey stated that airplanes from that airstrip never flew over his property. Second, he described the troopers' airplane as flying unusually low: He estimated they were roughly 100 to 200 feet above the tree line surrounding his property and stated that he could see a face looking out of the airplane's window as it flew by. The superior court rejected McKelvey's estimate and found that the airplane maintained an altitude of at least 600 feet the entire flight.

The superior court denied McKelvey's motion to suppress. The court found that the greenhouse was within McKelvey's curtilage — the area immediately adjacent to the home "to which extends the intimate activity associated with the 'sanctity of a [person's] home and the privacies of life.' "[3] It then applied the two-pronged test established in *Katz v. United States* to determine whether an illegal search occurred.[4] It first found that McKelvey had a subjective expectation of privacy in the contents of the greenhouse. But it then concluded that McKelvey's expectation of privacy in the greenhouse was objectively unreasonable. Because the greenhouse was visible to anyone flying overhead, the court decided it was objectively unreasonable for McKelvey to believe the greenhouse's contents would remain private. In support of this conclusion, the superior court noted the substantial amount of air travel in Alaska and the close proximity of an airstrip to McKelvey's home. The superior court therefore concluded that the troopers did not need a warrant to fly near McKelvey's property and peer into his greenhouse with a telephoto lens.

The parties then agreed to a bench trial on stipulated facts.[5] McKelvey was convicted of one count of third-degree misconduct involving a controlled substance (possession of methamphetamine) and one count of second-degree weapons misconduct (possessing a gun in connection with a drug crime).

---

[3]     *Oliver v. United States*, 466 U.S. 170, 180 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

[4]     *See Katz v. United State*s, 389 U.S. 347, 361 (1967) (Harlan, J., concurring) (contending government action only rises to the level of a search if it violates a subjective expectation of privacy that is objectively reasonable); *State v. Glass*, 583 P.2d 872, 875 (Alaska 1978) (citing *Smith v. State*, 510 P.2d 793, 797 (Alaska 1973)) (recognizing Alaska's adoption of the two-part expectation-of-privacy test first set forth in Justice Harlan's concurrence in *Katz*).

[5]     In cases in which parties disagree about what the law requires, but do not disagree about what happened, they sometimes agree to streamline the case by agreeing (or stipulating) to what happened and having a trial in front of a judge instead of a jury.

## C.   Court Of Appeals' Decision

McKelvey appealed his conviction to the court of appeals, arguing that the superior court erred when it denied his motion to suppress.[6]  The court of appeals reversed the superior court, holding that under the Alaska Constitution the troopers were required to obtain a warrant before observing McKelvey's property from the air using a telephoto lens.[7]

The court first analyzed McKelvey's expectation of privacy under the Fourth Amendment to the United States Constitution.  After reviewing the United States Supreme Court decisions relating to aerial surveillance and sense-enhancing technology — *California v. Ciraolo*, *Florida v. Riley*, and *Kyllo v. United States*[8] — the court concluded that the Supreme Court has not directly considered the issue of warrantless aerial surveillance enhanced by a telephoto lens.[9]  The court of appeals determined that the Supreme Court's decisions on overflight observations made it "unlikely" that the flight and photographs violated the Fourth Amendment but declined to reach a definitive answer.[10]

The court then turned to McKelvey's expectation of privacy under the Alaska Constitution.  It first considered the privacy implications of aerial surveillance in general.  The court began by noting that Alaskans have a heightened privacy interest

---

[6]   *McKelvey v. State*, 474 P.3d 16, 19-21 (Alaska App. 2020).

[7]   *Id.* at 19.

[8]   *California v. Ciraolo*, 476 U.S. 207 (1986) (holding that photography of curtilage with 35-mm camera during flight of 1,000 feet over home did not require warrant); *Florida v. Riley*, 488 U.S. 445 (1989) (holding that naked eye observation of curtilage during helicopter flight at altitude of 400 feet did not require warrant); *Kyllo v. United States*, 533 U.S. 27 (2001) (holding that the use of non-commercially available thermal-imaging device to see inside home required warrant).

[9]   *McKelvey*, 474 P.3d at 22-26.

[10]   *Id.* at 25-26.

in being left undisturbed in their homes, which includes the curtilage.[11] It recognized that preventing aerial surveillance of the home and curtilage requires "extraordinary measures" that would interfere with regular enjoyment of the home and would not be feasible for most people to implement.[12] It reasoned that the privacy intrusion from a typical civilian overflight is minimal — allowing only "fleeting, anonymous, and nondiscriminating" views of the curtilage.[13] By contrast, the court emphasized that the troopers purposefully targeted McKelvey's home, concluding that these purposeful observations were "qualitatively different" than a typical overflight because they are more likely to allow for detailed and intrusive observations.[14] Accordingly the court concluded that McKelvey's failure to protect his curtilage against aerial observation did not mean that he lacked a reasonable expectation of privacy in his curtilage.[15] In reaching this conclusion, the court relied heavily upon the dissents from *Ciraolo* and *Riley* and extensively cited decisions from the courts of Vermont, California, and Hawai'i which held that the constitutions of those states prohibited aerial observation of a home's curtilage in certain circumstances.[16]

Yet after extensively discussing the implications of aerial surveillance generally, the court declined to decide whether to adopt the "same broad rule" as those

---

[11] *Id.* at 27.

[12] *Id.* at 31.

[13] *Id.* at 28 (quoting *Ciraolo*, 476 U.S. at 223 (Powell, J., dissenting)).

[14] *Id.* at 28 n.63 (noting that the use of the term "purposeful" was only "a means to explain how the police *conduct* — low-altitude surveillance targeted at a specific location — was qualitatively different . . . from the conduct (i.e., passing glimpses) of commercial air travelers" (emphasis in original)).

[15] *Id.* at 28-29.

[16] *See id.* (discussing *Ciraolo* dissent); *id.* at 30 (discussing *Riley* dissent); *id.* at 29 (citing *State v. Bryant*, 950 A.2d 467, 475 (Vt. 2008)); *id.* at 31-32 (first citing *People v. Cook*, 710 P.2d 299, 305-08 (Cal. 1985); and then citing *State v. Quiday*, 405 P.3d 552, 562 (Haw. 2017)).

other state courts.[17] The court of appeals focused on the use of a telephoto lens, which allowed the troopers to obtain a more detailed view than their naked eyes would permit from the same aerial vantage point.[18] It held that this combination turned the officers' observations of McKelvey's curtilage into a search that required a warrant.[19]

The State of Alaska petitioned for hearing,[20] arguing that the flight and use of a telephoto lens did not constitute a search requiring a warrant under either federal or state law. We granted the petition and ordered full briefing.[21]

## III. DISCUSSION

### A. The Alaska Constitution Strongly Protects Against Unreasonable Searches And Seizures.

Article I, section 14 of the Alaska Constitution protects the "right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures."[22] "[A] search without a warrant is per se

---

[17]    *Id.* at 32.

[18]    *Id.*

[19]    *Id.* at 33 ("[W]hen an individual has taken reasonable steps to protect their house and curtilage from ground-level observation, that individual has a reasonable expectation that law enforcement officers will not use a telephoto lens or other visual enhancement technology to engage in aerial surveillance of the individual's residential property for the purpose of investigating criminal activity.").

[20]    Alaska R. App. P. 302 (authorizing this court's discretionary review of final decisions of the court of appeals); Alaska R. App. P. 304 (establishing criteria for exercise of discretionary review).

[21]    We invited the Public Defender Agency to file an amicus curiae brief. "Amicus curiae" is Latin for "friend of the court." When people or organizations have special expertise or an important stake in an issue that a court is deciding, the court may invite them to file a brief to help the court understand the issue and inform its decision. We thank the Agency for its helpful briefing in this matter.

[22]    Alaska Const. art. I, § 14. Because we conclude that the search was unlawful under the Alaska Constitution, we need not decide whether it was unlawful under the federal constitution.

unreasonable unless it clearly falls within one of the narrowly defined exceptions to the warrant requirement."[23] But not all attempts to observe by government officials amount to a "search." For example, "the mere observation of items which are in plain view or which are open and apparent[] is not a search."[24] Police do not need to get a warrant to observe things that are in plain view.

To determine whether government conduct is a "search," we use the test the Supreme Court adopted in *Katz v. United States* when interpreting the analogous Fourth Amendment to the U.S. Constitution.[25] Under the *Katz* test, government conduct amounts to a search if it violates a defendant's subjective expectation of privacy and that expectation is objectively reasonable.[26] The State concedes that McKelvey had a subjective expectation of privacy in the contents of the greenhouse. The only issue for us to decide is whether his expectation of privacy was objectively reasonable. Whether a subjective expectation of privacy was objectively reasonable is a question of constitutional law that we review using our independent judgment, adopting the rule that is most persuasive in light of precedent, reason, and policy.[27]

The underlying purpose of the *Katz* test is the same for both the U.S. Constitution and the Alaska Constitution. We do not seek "to shield criminals nor to make the home a safe haven for illegal activities."[28] Instead we seek "to safeguard the privacy and security of individuals against arbitrary invasions by governmental

---

[23] *Erickson v. State*, 507 P.2d 508, 514 (Alaska 1973).

[24] *Klockenbrink v. State*, 472 P.2d 958, 961 (Alaska 1970).

[25] *See State v. Glass*, 583 P.2d 872, 875 (Alaska 1978).

[26] *See California v. Ciraolo*, 476 U.S. 207, 211 (1986) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)); *Glass*, 583 P.2d at 875.

[27] *Beltz v. State*, 221 P.3d 328, 332 (Alaska 2009).

[28] *Smith v. State*, 510 P.2d 793, 800 (Alaska 1973) (Rabinowitz, C.J., dissenting) (quoting *McDonald v. United States*, 335 U.S. 451, 455-56 (1948)).

officials."[29]  Yet our approach to interpreting the Alaska Constitution is qualitatively different than federal courts' approach to interpreting the U.S. Constitution.

The federal approach to determining whether people have an objectively reasonable expectation of privacy in a particular situation essentially treats this inquiry as a question of fact, focusing on what is commonly practiced.[30]  For example, in *Riley* Justice Brennan's dissent criticized the plurality's[31] approach for functionally turning the question whether a person has a reasonable expectation of privacy against aerial surveillance into a factual question:  whether "a single member of the public could conceivably position herself to see into the area in question without doing anything illegal."[32]  Likewise, in *Kyllo* the court held that whether a technologically enhanced observation of the home was a search turned on whether the device the police used (a thermal-imaging device) was "in general public use" — another inherently factual question.[33]  And in *Smith v. Maryland*, the court held that individuals had no reasonable expectation of privacy in the digits they dialed because telephone companies must keep records of the numbers dialed for billing purposes, and the company may share these records with others.[34]  Justice Marshall's dissent criticized this approach as unduly

---

[29]     *Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 528 (1967).

[30]     *See, e.g.*, 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 2.1(d), at 603-11 (6th ed. 2020) (noting and criticizing federal courts' approach).

[31]     In order to be binding law, an opinion must generally be joined by a majority of voting judges.  If no opinion is joined by a majority of voting judges, then the opinion that receives the most votes is referred to as the "plurality."  This opinion is generally not binding but it is viewed as highly persuasive.

[32]     *Florida v. Riley*, 488 U.S. 445, 457 (1989) (Brennan, J., dissenting).

[33]     *Kyllo v. United States*, 533 U.S. 27, 34 (2001).

[34]     442 U.S. 735, 743 (1979).

focused on the factual question of what telephone companies actually do, rather than "on the risks [one] should be forced to assume in a free and open society."[35]

By contrast, whether a particular expectation of privacy is objectively reasonable under the Alaska Constitution "entails 'a value judgment . . . whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a [degree] inconsistent with the aims of a free and open society.' "[36] This judgment is influenced by the fact that the Alaska Constitution, unlike the federal constitution, explicitly recognizes and protects the right to privacy.[37] We therefore "give section 14's protection against unreasonable searches and seizures 'a liberal interpretation' "[38] that "increases the likelihood that a person's expectation of privacy . . . can be deemed objectively reasonable."[39]

## B. We Decline To Extend The "Open View" Doctrine To Aerial Surveillance From Public Airspace.

The State's argument for why its officers did not need a warrant to observe McKelvey's greenhouse from the air is straightforward. The State argues that, because any member of the public can observe a person's curtilage from a low-flying aircraft using a zoom lens, a person has no reasonable expectation that items or activities in the curtilage are private.

---

[35]    *Id.* at 750 (Marshall, J., dissenting).

[36]    *Cowles v. State*, 23 P.3d 1168, 1171 (Alaska 2001) (alterations in original) (quoting 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 2.1(d), at 393 (3d ed. 1996)).

[37]    Alaska Const. art. I, § 22 ("The right of the people to privacy is recognized and shall not be infringed.").

[38]    *State v. Gibson*, 267 P.3d 645, 659 (Alaska 2012) (quoting *Municipality of Anchorage v. Ray*, 854 P.2d 740, 750 (Alaska App. 1993)).

[39]    *Beltz v. State*, 221 P.3d 328, 334 (Alaska 2009).

The State relies on our decisions applying the "open view" doctrine: "Activities that are open to public observation are not generally protected by the Fourth Amendment" or article I, section 14 of the Alaska Constitution.[40] In particular the State argues that the court of appeals erred by overlooking our decision in *Cowles v. State*, which held that authorities did not have to get a warrant before using a hidden overhead camera to record suspected criminal activity in a workplace that was visible to the public.[41] The State argues that the troopers' actions in this case were similar. They placed themselves where any member of the public could be, and used a fairly common type of camera to observe what any member of the public could see. As further support for its argument, the State emphasizes that we have held that officers' use of binoculars or flashlights to better see does not turn an observation into a search.[42]

Relatedly, the State faults the court of appeals' reliance on dissents in Supreme Court decisions addressing aerial observation. The State acknowledges that the Alaska Constitution is generally more protective than the federal constitution. But it argues that our decision in *Cowles* is more consistent with the majority opinions in

---

[40] *Cowles*, 23 P.3d at 1171; *accord Pistro v. State*, 590 P.2d 884, 887 (Alaska 1979) (holding there was no search when officers walked down private driveway "impliedly open to the public" and observed defendant in his garage); *Daygee v. State*, 514 P.2d 1159, 1162 (Alaska 1973) (holding that observation of "that which is in the plain view of an officer who is rightfully in a position to have that view" is not a search). *See also Anderson v. State*, 444 P.3d 239, 243 (Alaska App. 2019) (discussing this doctrine — which is often described as plain view — and describing why it is better conceived as "open view").

[41] 23 P.3d at 1175.

[42] *Daygee*, 514 P.2d at 1162 (holding that the officer did not perform a search when he shone a flashlight into the back of the car); *see also Anderson v. State*, 555 P.2d 251, 257 n.29 (Alaska 1976) ("As with flashlight observations, courts have had little difficulty sustaining the warrantless seizure of items observed in plain view with the assistance of binoculars.").

those Supreme Court cases, which concluded that police did not have to get a warrant to observe the curtilage from an aircraft flying in public airspace.

These arguments require us to decide whether the "open view" doctrine applies to airborne views as well as to views from the ground. When confronting novel constitutional questions, "sound analysis requires that we look to the various federal precedents that have interpreted provisions of the federal constitution that parallel Alaska's constitution."[43]

The Supreme Court has held that naked-eye aerial surveillance of the curtilage is not a search that requires a warrant. In *California v. Ciraolo* the Court held that warrantless "naked-eye observation of the curtilage by police from an aircraft lawfully operating at an altitude of 1,000 feet" did not violate the Fourth Amendment.[44] The Court essentially applied the rules for ground-level observation of the curtilage to aerial observation.[45] According to this logic, if the public could lawfully make the same observations that the police did, then no search occurred.

In *Florida v. Riley* a fractured majority held that police did not require a warrant when they flew a helicopter over the defendant's property at 400 feet and observed marijuana growing in his greenhouse with their naked eyes.[46] The plurality held that this issue was controlled by *Ciraolo*: The observation was from a helicopter flying in public airspace, meaning that "[a]ny member of the public could legally have been flying over Riley's property . . . and could have observed Riley's greenhouse" in

---

[43]     *Breese v. Smith*, 501 P.2d 159, 167 (Alaska 1972).

[44]     476 U.S. 207, 213 (1986).

[45]     *Id.* ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.").

[46]     488 U.S. 445, 451-52 (1989).

the manner that the officers did.[47] Justice O'Connor concurred but expressed dissatisfaction with the plurality's framing of the issue. She wrote that "[t]he fact that a helicopter could conceivably observe the curtilage at virtually any altitude or angle, without violating Federal Aviation Administration regulations, does not in itself mean that an individual has no reasonable expectation of privacy from such observation."[48] In her view the analysis should be "whether the helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity" that the defendant's expectation of privacy was objectively unreasonable.[49] Justice O'Connor concluded that the defendant bore the burden of proof for this question but failed to meet it.[50] Thus, no warrant was required.

The Supreme Court has not directly considered the use of vision-enhancing technology to observe the curtilage during aerial observation. The Court was careful to note in *Ciraolo* that "[a]erial observation of curtilage may become invasive, either due to physical intrusiveness or through modern technology which discloses to the senses those intimate associations, objects or activities otherwise imperceptible to police or fellow citizens."[51] But the Court has not provided further guidance. In the related context of ground-level observations, the Court explicitly approved the use of binoculars and generally approved the use of commercially available technology to attempt to peer inside the home.[52] Likewise, the Court has approved the use of

---

[47]    *Id.* at 451.

[48]    *Id.* at 454 (O'Connor, J., concurring).

[49]    *Id.*.

[50]    *Id.* at 455.

[51]    *California v. Ciraolo*, 476 U.S. 207, 215 n.3 (1986) (alteration in original).

[52]    *See On Lee v. United States*, 343 U.S. 747, 754 (1952) ("The use of bifocals, field glasses or the telescope to magnify the object of a witness' vision is not a forbidden search or seizure, even if they focus without his knowledge or consent upon

advanced cameras and lenses to photograph an industrial site from the air, but that opinion was careful to note that its holding did not extend to homes.[53]

The State correctly points out that our decision in *Cowles* endorsed, to some extent, the majority opinion in *Ciraolo* and Justice O'Connor's concurring opinion in *Riley*. In *Cowles* we ruled that a public employer did not need a warrant to install a hidden camera in the ceiling above an employee's desk when the desk was visible to the public, albeit from a different vantage point.[54] We began with the "open view" doctrine: "Activities that are open to public observation are not generally protected . . . ."[55] We rejected the argument that placing a video camera in "an especially good position" made the observation a "search" when the area being observed could be seen by the public.[56] Citing *Ciraolo* and Justice O'Connor's concurring opinion in *Riley*, we also rejected the argument that the purpose of the surveillance — detecting criminal activity — was relevant to the employee's reasonable expectation of privacy.[57] We approvingly cited Justice O'Connor's concurrence in *Riley* for the proposition that if a person's activities can be observed from a vantage

---

what one supposes to be private indiscretions."); *cf. Kyllo v. United States*, 533 U.S. 27, 40 (2001) (holding that obtaining information about constitutionally protected area using sense-enhancing technology constitutes search when that technology is not in general public use).

[53] *Dow Chem. Co. v. United States*, 476 U.S. 227, 239 (1986) (holding government's use of sophisticated cameras and zoom lenses to photograph industrial site was not a search); *id.* at 237 n.4 (noting, for purposes of its analysis, that "it [is] important that this is *not* an area immediately adjacent to a private home, where privacy expectations are most heightened" (emphasis in original)).

[54] *Cowles v. State*, 23 P.3d 1168, 1170-71 (Alaska 2001).

[55] *Id.* at 1171.

[56] *Id.* at 1172.

[57] *Id.* at 1172-73.

point generally used by the public, that person cannot reasonably expect privacy from observation by police.[58]

The State argues that this logic should govern here. Because the troopers observed what any person flying in the air might observe, McKelvey had no reasonable expectation that his curtilage would be free from aerial observation with vision-enhancing technology. And although *Cowles* did not involve observation of the home, the State points out that we have applied the open view doctrine to hold that police do not engage in a search by looking inside the home when standing in a public place.[59]

The court of appeals did not expressly reconcile *Cowles* or our other "open view" decisions with its conclusion that the Alaska Constitution does not permit authorities to observe curtilage that is visible from public airspace.[60] Yet the court of appeals' reasoning implicitly recognized that the assumptions underlying the open view doctrine do not apply with the same force to airborne views, at least when the home is concerned.[61]

"If there is any area of human activity to which a right to privacy pertains more than any other, it is the home."[62] Protection of the home extends to the

---

[58] *Id.* at 1173 n.21 (citing *Florida v. Riley*, 488 U.S. 445, 453 (1989) (O'Connor, J., concurring)).

[59] *Pistro v. State*, 590 P.2d 884, 886-87 (Alaska 1979); *Daygee v. State*, 514 P.2d 1159, 1162 (Alaska 1973).

[60] *See McKelvey v. State*, 474 P.3d 16, 28 n.63 (Alaska App. 2020) (addressing *Cowles* only to explain that authorities' subjective purpose of detecting criminal activity did not affect analysis of whether conduct amounted to search). That is not to fault the court of appeals. The State did not emphasize *Cowles* and our other open view decisions in its briefing to that court.

[61] *See id.* at 31 (describing difficulty of protecting curtilage from aerial observation).

[62] *Ravin v. State*, 537 P.2d 494, 503 (Alaska 1975); *accord Lum v. Koles*, 426 P.3d 1103, 1112-13 (Alaska 2018).

curtilage — the area outside the walls of a home into which the "privacies of life" may extend.[63] Although a person's home is a place where the person expects privacy, it is generally true that objects, activities, or statements "expose[d] to the 'plain view' of outsiders are not 'protected' because no intention to keep them [private] has been exhibited."[64] When a person has taken no steps to protect the area immediately outside the person's home from view, that person cannot reasonably expect items or activities in this area will remain private or protected from the eyes of passersby — or police.[65] But this framework breaks down when applied to aerial observations.

An unstated premise of the ground-level open view doctrine is that people can protect their privacy through reasonable steps, such as building fences, planting trees, or closing blinds.[66] Or they can choose, like McKelvey, to live in a home in the

---

[63] *Oliver v. United State*s, 466 U.S. 170, 180 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)); *see also Fraiman v. State, Dep't of Admin., Div. of Motor Vehicles*, 49 P.3d 241, 245 n.21 (Alaska 2002); *Kelley v. State*, 347 P.3d 1012, 1013-14 (Alaska App. 2015).

[64] *Smith v. State*, 510 P.2d 793, 797 (Alaska 1973) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

[65] *Cowles v. State*, 23 P.3d 1168, 1171 (Alaska 2001) ("Activities that are open to public observation are not generally protected by the Fourth Amendment [or article I, section 14]."); *Pistro v. State*, 590 P.2d 884, 887 (Alaska 1979) (holding there was no search when officers walked down private driveway "impliedly open to the public" and observed defendant in his garage); *Daygee v. State*, 514 P.2d 1159, 1162 (Alaska 1973) (holding that there was no search when police "observe[d] that which is in the plain view of an officer who [was] rightfully in a position to have that view"); *see also California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.").

[66] *See Lorenzana v. Superior Ct.*, 511 P.2d 33, 36, 44 (Cal. 1973) (holding plain view did not apply when officer walked within six inches of house and peered through a two-inch gap between drawn blinds and windowsill); *State v. Morrow*, 291 N.W.2d 298, 299 (Wis. App. 1980) (holding implicitly that plain view did not apply when officer assumed prone position on floor of hotel hallway to look under door into

middle of the woods that is not visible to outsiders. By doing so people may control how much outsiders see of their private lives. Failing to do so makes it unreasonable to expect privacy. But a person cannot easily protect against aerial observation. By going airborne a person can see the home or curtilage from "virtually any altitude or angle."[67] "[E]ven individuals who have taken effective precautions to ensure against ground-level observations cannot block off all conceivable aerial views of their outdoor patios and yards without entirely giving up their enjoyment of those areas."[68]

Extending the open view doctrine from the ground to the air would conflict with *Katz*'s maxim that "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."[69] For example, the constitutional protection against unreasonable search and seizure applies to boxes carried in public, letters sent in the mail, and even phone calls made in public telephone booths.[70] Determining whether a constitutional protection survives exposure to a

---

room); *State v. Adams*, 378 So. 2d 72, 74 (Fla. App. 1979) (holding plain view did not apply when police looked in defendant's room in a rooming house by going onto the porch and then standing on a chair to peer through a window above eye level); *cf. State v. Johnson*, 580 S.W.2d 254, 257 (Mo. 1979) (holding plain view applied when window had no curtains or blinds and officers could "readily" see inside); *United States v. Llanes*, 398 F.2d 880, 884 (2d Cir. 1968) (holding plain view applied when officers overheard defendant's conversation, which was "quite audible," while standing in apartment hallway); *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997) (holding plain view applied when police looked through "plainly visible five- to six-inch gap" in blinds).

[67] *Florida v. Riley*, 488 U.S. 445, 454 (1989) (O'Connor, J., concurring).

[68] *Id.*

[69] *Katz v. United States*, 389 U.S. 347, 351 (1967).

[70] *Rios v. United States*, 364 U.S. 253, 254, 261-62 (1960) (holding owner of box taken into public had reasonable expectation of privacy in its contents); *Ex parte Jackson*, 96 U.S. 727, 733 (1877) ("Letters and sealed packages . . . in the mail are as fully guarded from examination and inspection, except as to their outward form and

publicly accessible area is, at base, an inquiry into reasonableness.[71]  Boxing up an item, sealing an envelope, or closing a telephone booth door do not create impenetrable privacy barriers.  But taking those steps is enough to create a reasonable expectation of privacy, which is all that the constitution requires.  Likewise, building fences, planting trees, or living in a home in the middle of the woods that is not visible to outsiders does not completely shield one's curtilage from view, especially from aerial surveillance.  But to require more would force people to give up the privacy of their yards just because it is not feasible to block aerial surveillance.  This rule would be unreasonable and "inconsistent with the aims of a free and open society."[72]  The open view doctrine therefore is not a good fit for aerial observations.

Our conclusion draws support from the Supreme Court's more recent approach to the Fourth Amendment.  In *Carpenter v. United States* the Court declined to apply the established "third-party doctrine" to cellphone location records because of their "unique nature."[73]  This doctrine holds that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."[74]  The records at issue indicated when a cellphone connected to a specific cell site, showing where the

---

weight, as if they were retained by the parties forwarding them in their own domiciles."); *Katz*, 389 U.S. at 352 (holding individuals maintain reasonable expectation of privacy in contents of phone calls made in public telephone booths).

[71]     *Anchorage v. Cook*, 598 P.2d 939, 941 (Alaska 1979) ("The touchstone of our analysis under [article I, section 14 and] the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (internal quotation marks omitted))).

[72]     *Cowles v. State*, 23 P.3d 1168, 1171 (Alaska 2001).

[73]     *See Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (declining to apply the third-party doctrine to cell site location information because of "the unique nature of cell phone location records").

[74]     *Id.* at 2216 (quoting *Smith v. Maryland*, 442 U.S. 735, 743-744 (1979)).

phone was located at that time.[75]  Collecting these records allows police to reconstruct a person's movements over time.  Because this information is shared with a cellphone service provider, lower federal courts had held that the government could acquire this information without a warrant under the third-party doctrine.[76]  The Supreme Court rejected that approach.  It reasoned that the third-party doctrine was designed for substantially less intrusive records — copies of "canceled checks, deposit slips, and monthly statements" — not the "all-encompassing record of the holder's whereabouts" that cell site location data provides.[77]  Because of these differences, applying the third-party doctrine to cell site location information would have been "a significant extension" of this doctrine — not, as the government claimed, "a straightforward application" of it.[78]  The Supreme Court declined to extend it.[79]

*Carpenter*'s holding is not directly applicable to this case.  Aircraft and cameras with zoom lenses are not new technology, and *Carpenter* expressly stated that it was not "call[ing] into question conventional surveillance techniques and tools."[80]  But aspects of the Court's reasoning support our decision not to extend the "open view" doctrine to aerial views.  First, the Court refused to "mechanically" apply its existing doctrines to a "qualitatively different" kind of technology.[81]  Second, it relied on the

---

[75]  *Id.* at 2211-12.

[76]  *See, e.g.*, *United States v. Davis*, 785 F.3d 498, 509-11 (11th Cir. 2015); *United States v. Graham*, 824 F.3d 421, 425-26 (4th Cir. 2016).

[77]  *Carpenter*, 138 S. Ct. at 2216-17.

[78]  *Id.* at 2219.

[79]  *Id.* at 2223.

[80]  *Id.* at 2220.

[81]  *Id.* at 2216, 2219.

practical impossibility of protecting oneself from collection of cell site location data.[82] The same points support our decision not to mechanically extend the open view doctrine to airborne surveillance.[83]

### C. Alaskans Have A Reasonable Expectation That Authorities Will Not Examine The Curtilage Of Their Homes From Aircraft With High-Powered Optics.

Because the open view doctrine does not control our decision in this case, we consider directly whether allowing the government to view the curtilage of a person's home from an aircraft, using a camera equipped with zoom lens, without first getting a warrant, is consistent with the aims of a free and open society.[84] "Whether an expectation of privacy is justified 'must . . . be answered by assessing the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement.' "[85]

The most important point in this analysis is the degree to which a type of police surveillance can reveal intimate details of life that a person may wish to keep private. In *Glass v. State* we held that to allow warrantless recordings of telephone calls risked chilling "public and private expression on the great issues of our day, as well as

---

[82]    *Id.* at 2220 (rejecting rationale of "voluntary exposure" because "cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society' " (quoting *Riley v. California*, 573 U.S. 373, 385 (2014))).

[83]    Because we conclude that the open view doctrine does not govern the circumstances of this case, we decline the Public Defender Agency's invitation to revisit whether *Cowles* was correctly decided.

[84]    *See Weltz v. State*, 431 P.2d 502, 506 (Alaska 1967) (noting there is "no exact formula for the determination of reasonableness in connection with a search and seizure and so each case must be decided on its own facts and circumstances").

[85]    *Cowles v. State*, 23 P.3d 1168, 1171 (Alaska 2001) (alterations in original) (quoting *United States v. White*, 401 U.S. 745, 787 (1971) (Harlan, J., dissenting)).

private discussion about the mundane, the trivial, and the banal," turning our "once free society" into "a nation of 'hagridden and furtive' people."[86] Although people regularly make "thoughtless comments about sex, religion, politics, acquaintances, personal finances and even one's innermost thoughts" to their friends,[87] "[f]ew of us would ever speak freely if we knew that all our words were being captured by machines for later release before an unknown and potentially hostile audience."[88] "Faced with the choice of silence or the risk that comments will be 'etched in stone,' a speaker may choose the former alternative, to the manifest diminution of the spontaneity which marks our daily discourse."[89] The chilling effect would not be limited to those engaged in illegal activity: "If . . . law enforcement officials may lawfully cause participants secretly to record and transcribe private conversations, nothing prevents monitoring of those persons not engaged in illegal activity, who have incurred displeasure, have not conformed or have espoused unpopular causes."[90]

In *Beltz v. State* we held that the constitution prohibits indiscriminate searches of people's garbage.[91] We reasoned that people's expectation that their garbage will remain private is somewhat diminished because they put it in a public place for collection, where it is exposed to "potential intrusions by intermeddling humans (even garbage collectors)."[92] But we concluded that because a person's garbage can

---

[86] *State v. Glass*, 583 P.2d 872, 877 (Alaska 1978) (quoting *Holmes v. Burr*, 486 F.2d 55, 65 (9th Cir. 1973) (Hufstedler, J., dissenting)).

[87] *Id.* at 878.

[88] *Id.* at 877 (quoting *Holmes*, 486 F.2d at 72 (Hufstedler, J., dissenting)).

[89] *Id.* at 878.

[90] *Id.*

[91] *Beltz v. State*, 221 P.3d 328, 335 (Alaska 2009).

[92] *Id.* at 336. *But see id.* at 340-42 (Winfree, J., dissenting) (arguing that the "comprehensive regulation of the storage and presentation of garbage for collection" undercuts notion that acceptance of this risk is voluntary).

reveal so much "highly personal information" — such as the type of medication the person is using — allowing unfettered searches of garbage would violate Alaskan's sense of security and privacy.[93]  Accordingly we held that police may search garbage set out for public collection only if they have reasonable suspicion that a crime had been committed.[94]

Peering into people's yards with a high-powered lens when flying overhead has a similar potential to reveal intimate details that a person may wish, and expect, to keep private.  Aerial observation with the aid of a zoom lens might capture, for example, an unflattering photo of a person in a swimsuit, images of a person practicing a silly dance with their children, or expressions of religious devotion that one might not wish others to see.  The mere knowledge that the government could make these kinds of detailed observations without a warrant may discourage Alaskans from using their curtilage to live their private lives.[95]

One could reasonably wonder just how chilling the specter of warrantless aerial observation of the home would be.  Aviation gas is expensive, officers are busy, and the likelihood of detecting criminal activity with indiscriminate surveillance flights is low.  Consequently, aerial surveillance of people's curtilage by law enforcement may be infrequent.  But as the court of appeals astutely observed, the rise of drones has the

---

[93]  *Id.* at 335-36 (majority opinion).

[94]  *Id.* at 336.  Probable cause exists "when reliable information is set forth in sufficient detail to warrant a reasonably prudent man in believing that a criminal offense has been or was being committed."  *Harrelson v. State*, 516 P.2d 390, 396 (Alaska 1973).  Reasonable suspicion is a lower standard that exists when "the totality of the circumstances indicates that there is a substantial *possibility* that conduct giving rise to a public danger has occurred, is occurring, or is about to occur."  *Beltz*, 221 P.3d at 337 (emphasis in original).

[95]  *See United States v. Torres*, 751 F.2d 875, 878 (7th Cir. 1984) ("[S]ecretly televising people (or taking still or moving pictures of them) while they are in what they think is a private place is an even greater intrusion on privacy than secretly recording their conversations.").

potential to change that equation.[96]  The State responds that this case does not involve drones, that drone use by law enforcement officials is currently limited by statute,[97] and that there may be reasons to distinguish the use of drones from the use of manned aircraft for law enforcement purposes.  All those things are true.  But the legal status of drones could change.  And it would not be wise for us to ignore, when assessing the risk that warrantless aerial surveillance poses to Alaskans' sense of security and freedom, the likelihood that advances in technology will make aerial surveillance cheaper and more feasible in the coming years and decades.

The State argues that, considering the totality of the circumstances surrounding the troopers' observation of McKelvey, allowing this kind of observation without a warrant would not be unduly chilling.  The State emphasizes several factors: (1) the ubiquity of small-aircraft travel in Alaska; (2) the unobtrusiveness of the troopers' flight; (3) the troopers' use of a camera and lens that any person could buy; (4) the relatively low level of detail in the photos taken; (5) the availability of satellite images of McKelvey's (and everyone's) property on the internet; and (6) the utility of warrantless aerial surveillance to law enforcement.[98]  The State also invites us to follow

---

[96]  *See McKelvey v. State*, 474 P.3d 16, 30 (Alaska App. 2020) (reasoning that "in light of [drone] technology, an approach that focuses on the amount of disruption or disturbance caused by the police surveillance is fundamentally inadequate to protect the rights guaranteed to Alaska's citizens by our constitution").

[97]  AS 18.65.900-.902.

[98]  The State argues that we should consider McKelvey's failure to protect his greenhouse and marijuana plants from aerial observation as a factor weighing against his reasonable expectation of privacy.  As we explained in the preceding section, because it is not practical to protect one's curtilage from aerial observation without virtually destroying the ability to use and enjoy it, the failure to do so does not diminish one's reasonable expectation of privacy.  If a person failed to protect their curtilage from ground-level view, then the person would not have a reasonable expectation of privacy in the curtilage from the air or the ground.

the lead of other state courts that have held that aerial observation by police does not require a warrant. We address each argument in turn.

### 1. Ubiquity of small-aircraft travel in Alaska

The State argues that because flights on small aircraft are so common everywhere in Alaska, Alaskans cannot reasonably expect privacy in the curtilage of their homes. Pointing to the superior court's findings, the State asserts passengers in these aircraft fly relatively close to the ground, at low speeds, and regularly use binoculars and high-powered cameras to view the ground below. We accept the State's assertion that there is more air travel per capita in Alaska than the average state and that the small aircraft so common here fly at slower speeds and lower altitudes than the big aircraft that predominate Outside. But there is no support for the State's suggestion that pilots and passengers regularly examine the curtilage of people's homes with high-powered optics. People train their cameras and binoculars on Alaska's majestic scenery and wildlife. There is no reason to think they are focused on the bleached garden boxes, tangled fishing nets, and parted-out snowmachines lying next to people's homes. The fact that it is common for small aircraft to fly overhead does not make it unreasonable for Alaskans to think that what they do in the outdoor space of their homes that they have tried to keep private will remain private.

### 2. Obtrusiveness of the troopers' flight

The State asserts that the troopers' flight was particularly unobtrusive because they did not fly directly over McKelvey's property. Obtrusive aerial surveillance — like a helicopter hovering directly above one's home for 10 minutes — would certainly be chilling. But the knowledge that police may discretely surveil you from the air without your even noticing it is equally chilling to one's sense of privacy. The wiretaps in *Glass* were not obtrusive. But that is why they were so insidious and

corrosive to Alaskans' sense of security.[99]  If the surveillance technique cannot be detected, then one can never fully protect against being surveilled.

### 3. Use of a commercially available camera and zoom lens

As a threshold matter the State asserts that distinguishing between naked-eye observation and observation aided by technology is inconsistent with our case law. To be sure, we have held that it is not a search to use vision-enhancing technology to view what is already within open view *from the ground*.[100]  But we have already explained why we decline to mechanically extend our precedent on ground-level surveillance.  And it is just common sense to acknowledge that using aircraft exponentially increases the power of vision-enhancing tools to produce detailed glimpses of a person's yard.  This case does not require us to decide whether aerial observation of the curtilage *without* vision-enhancing technology requires a warrant.[101]  What we do recognize is that the combination of flight and high-powered optics gives

---

[99]    *State v. Glass*, 583 P.2d 872, 877 (Alaska 1978) (noting that mere possibility of widespread covert recording "pose[d] 'a grave danger of chilling all private, free, and unconstrained communication' " (quoting *Lopez v. United States*, 373 U.S. 427, 452 (1963) (Brennan, J., dissenting))).

[100]    *See Anderson v. State*, 555 P.2d 251, 257 (Alaska 1976) (holding officer's use of flashlight to aid observation was not a search).

[101]    The concurrence states that we should decide this issue nonetheless and hold that any "targeted" aerial surveillance of the curtilage from the air requires a warrant, regardless of whether vision-enhancing technology is used.  Although the dissent suggests that our rejecting the open view doctrine compels a rule against all targeted aerial surveillance of the curtilage, that conclusion does not follow automatically.  Our precedent requires us to "assess[] the nature of a *particular practice* and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement." *Cowles v. State*, 23 P.3d 1168, 1171 (Alaska 2001) (emphasis added).  There is "no exact formula for the determination of reasonableness in connection with a search and seizure and so each case must be decided on its own facts and circumstances." *Weltz v. State*, 23 P.3d 1168, 1172 (Alaska 2001) (alterations in original).  For those reasons, we decline to go beyond the facts of this case.

law enforcement officials the power to see enough detail of a person's private life just outside the home to corrode Alaskans' sense of security. It is therefore a search that requires a warrant.

The State also argues that the specific observations did not violate any reasonable expectation of privacy because they were made with commercially available, commonly used equipment that did not allow for detailed observations of McKelvey's home. This point is not persuasive.

The commercial availability of a piece of technology is not an appropriate measure of whether the technology's use by the government to surveil violates a reasonable expectation of privacy. If it is not a search when the police make observations using technology that is commercially available, then the constitutional protection against unreasonable searches will shrink as technology advances. That may be the trajectory of the Fourth Amendment under the Supreme Court's seemingly fact-based approach to determining reasonable expectations of privacy.[102] As the Seventh Circuit recently observed, that approach creates a "precarious circularity."[103] Adoption of new technologies means "society's expectations of privacy will change as citizens increasingly rely on and expect these new technologies."[104] And "[o]nce a technology is widespread, the Constitution may no longer serve as a backstop preventing the government from using that technology to access . . . previously inaccessible private

---

[102] *See Kyllo v. United States*, 533 U.S. 27, 40 (2001) (holding whether police action amounted to search turned, in large part, on whether they used a commercially available device).

[103] *United States v. Tuggle*, 4 F.4th 505, 527 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 1107 (2022).

[104] *Id.*

information because doing so will no longer breach society's newly minted expectations."[105]

What's worse, new technologies often become embedded in society without full consideration of their privacy implications. Few of us likely understood the degree to which we were exposing our personal lives to data mining by technology firms when we signed up for social media. Few of us likely anticipated, when we began shopping for things online, that we would receive advertisements for car seats and burp cloths before telling anyone there was a baby on the way.[106]

The Alaska Constitution's protection against unreasonable searches is not yoked to the march of technology in the same way. Instead it requires a "value judgment" as to whether the government's unregulated use of technology to observe is consistent with Alaskans' expectation of a free society.[107] Aircraft and zoom lenses are not new technologies, of course. Yet we decline to hold that it is automatically reasonable for the government to use these tools to observe the private area outside Alaskans' homes just because these tools are widely available for purchase by the general public.

### 4. Level of detail captured by particular photos

As for the State's invitation to determine whether aerial observation amounts to a search based on the precise level of detail captured in particular photographs (or through the binocular lenses), this approach is impractical. The level of detail captured in aerial photographs can vary greatly due to small differences in

---

[105] *Id.* (calling on Supreme Court or Congress to change approach to determining reasonable expectation of privacy under Fourth Amendment).

[106] Kashmir Hill, *How Target Figured Out A Teen Girl Was Pregnant Before Her Father Did*, FORBES (Feb. 16, 2012), https://www.forbes.com/sites/kashmirhill/2012/02/16/how-target-figured-out-a-teen-girl-was-pregnant-before-her-father-did/?sh=489835e26668.

[107] *Cowles v. State*, 23 P.3d 1168, 1171 (Alaska 2001).

flight path, altitude, and lens power. Courts would have a hard time articulating a standard based on such "[s]ubtle distinctions," and law enforcement officials would have a hard time following it.[108]

Moreover, the level of detail captured in a particular observation is not a perfect proxy for how intrusive the act of observing was. As the Supreme Court noted in *Kyllo*, "there is no necessary connection between the sophistication of the surveillance equipment and the 'intimacy' of the details that it observes."[109] Although most aerial observations by police would likely not reveal anything particularly embarrassing, that is not the point. "A search is a search, even if it happens to disclose nothing but the bottom of a turntable."[110] We measure a search by its potential for intrusion, rather than what it actually reveals. Even relatively unsophisticated cameras, when used from an aircraft, can show an uncomfortably detailed image of a person lounging in a swimsuit.

### 5. Availability of satellite images on the internet

The fact that other images of McKelvey's curtilage are available online does not make his expectation of privacy in the curtilage unreasonable. These overhead images capture only a single moment in time, from a single vantage point, and are not frequently updated. The troopers spent the time and money to fly past McKelvey's home because doing so could give them far more information about what he did in his curtilage than searching online images. The existence of these online images does not

---

[108] *Ferguson v. State*, 488 P.2d 1032, 1035 (Alaska 1971) ("[T]he law of search and seizure should be written with a view to[wards] those whose conduct it is meant to control. Subtle distinctions, which even lawyers find hard of application, should be avoided.").

[109] *Kyllo v. United States*, 533 U.S. 27, 38 (2001).

[110] *Arizona v. Hicks*, 480 U.S. 321, 325 (1987) (lifting up stereo "a few inches" to look at its serial numbers was search for Fourth Amendment purposes).

make it unreasonable for people to expect privacy from aerial surveillance by the police with high-powered optics.

### 6. Utility of warrantless aerial surveillance of the curtilage

Determining whether a police practice is consistent with the Alaska Constitution's protection against unreasonable searches requires considering "the utility of the conduct as a technique of law enforcement."[111] Catching unlicensed growing operations is an important part of Alaska's regulatory framework for marijuana,[112] but the State has not explained why other police practices are ineffective in catching and deterring these operations. The State also raises the specter of child abduction, implying that without visually enhanced aerial observations police will struggle to locate missing children. But under the "exigent circumstances" exception to the warrant requirement, police do not need a warrant to search a property if there is a real risk a child will be injured without immediate police action.[113] And if police have reason to suspect that the child is being kept in a particular home and there are no exigent circumstances, then they may seek a warrant to search that home, including from the air. It is also worth

---

[111] *Cowles*, 23 P.3d at 1171 (quoting *United States v. White*, 401 U.S. 745, 787 (1971) (Harlan, J., dissenting)).

[112] *See* former AS 11.71.040(a)(3)(G), (2013) (possessing 25 or more marijuana plants is a class C felony); AS 17.38.070(b) (creating exception from usual criminal penalties for licensed commercial marijuana cultivators); AS 17.38.020(2) (creating exception from usual criminal penalties for individuals who cultivate six or fewer plants for personal use); 3 Alaska Administrative Code (AAC) 306.400(a) (prohibiting cultivation of marijuana that is not for personal use and not licensed); 3 AAC 306.840 (allowing up to $50,000 in fines for violations of marijuana regulations.

[113] *See Schultz v. State*, 593 P.2d 640, 642 (Alaska 1979) (noting warrantless searches are permissible in "those instances where there is a 'compelling need for official action and no time to secure a warrant' " (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978))); *accord Mincey v. Arizona*, 437 U.S. 385, 392 (1978) ("Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." (footnotes omitted)).

noting that most land in Alaska is not curtilage of the home, where the right to privacy is strongest. Therefore authorities are not necessarily restricted from using aircraft and vision-enhancing technology to surveil those areas. We are not persuaded that the need to investigate the curtilage of the home using aircraft paired with high-powered optics outweighs the corrosive impact of this practice on Alaskans' sense of privacy.[114]

### 7. Decisions by other courts

Finally, the State points to a number of other jurisdictions that have approved the use of telephoto lenses to peer into homes, including some that have approved the use of telephoto lenses during flights.[115] McKelvey counters with a number of jurisdictions that bar intrusive warrantless aerial observations of curtilage.[116]

---

[114] This case does not present, and therefore we decline to decide, the constitutionality of other kinds of aerial observation, like wildlife surveys, that may result in occasional observation of the curtilage by government officials using zoom lenses or binoculars. We note only that the chilling effect and relative societal benefit of these activities, which typically are announced to the public and conducted for discrete periods of time, may be different.

[115] *See, e.g.*, *State v. Vogel*, 428 N.W.2d 272, 274-77 (S.D. 1988) (holding that police could use camera with telephoto lens to photograph marijuana plants inside residence during aerial observation because there was "no showing that the cameras and lenses used . . . were 'sophisticated visual aids' or 'special equipment not generally in use' " and "Vogel made no effort to shield his marijuana plants from either an aerial or ground-level observation" (quoting *United States v. Kim*, 415 F. Supp. 1252, 1255-56 (D. Haw. 1976))); *State v. Rogers*, 673 P.2d 142, 144 (N.M. App. 1983) (holding that use of binoculars to "verify" naked-eye observation of marijuana did not violate Fourth Amendment); *State v. Lange*, 463 N.W.2d 390, 395 (Wis. App. 1990) (permitting aerial observation of marijuana within defendant's curtilage using "standard binoculars and cameras equipped with generally available standard and zoom lenses" so long as "overflights were not rare and the pilot was within navigable airspace specified by law").

[116] *See People v. Cook*, 710 P.2d 299, 305 (Cal. 1985) (holding "an individual has a reasonable expectation of privacy from purposeful police surveillance of his back yard from the air"); *State v. Quiday*, 405 P.3d 552, 561-62 (Haw. 2017) (holding that

The opinions of other courts interpreting other states' constitutions are helpful because they illuminate the issues we must consider and the different ways competing considerations may be balanced. But our analysis of what the Alaska Constitution requires is driven primarily by our own precedent, our own heightened guarantee of privacy, and our own social conditions.

Having considered those factors, we hold that the Alaska Constitution requires law enforcement officials to obtain a warrant before using aircraft and vision-enhancing technology (such as a camera with zoom lens or binoculars) to observe the curtilage of a person's home that is protected from ground-level observation. Because the troopers did not get a warrant before taking aerial photos of McKelvey's curtilage, it was error to deny McKelvey's motion to suppress evidence obtained as a result of those photos.

## IV. CONCLUSION

For the foregoing reasons, the court of appeals' decision is AFFIRMED.

---

"purposeful aerial surveillance of an individual's residence and curtilage qualifies as a 'search' under article I, section 7 of the Hawai'i Constitution" even though these residences and curtilage "may unavoidably be exposed to casual glances from passing aircraft" (quoting *Cook*, 710 P.2d at 304)); *see also State v. Bryant*, 950 A.2d 467, 475-782, 482 (Vt. 2008) (holding police violated state constitution when they hovered over defendant's property at a low-altitude for fifteen to thirty minutes to observe his marijuana plants).

MAASSEN, Justice, with whom CARNEY, Justice, joins, concurring.

I concur in today's opinion and write separately only because I believe it is narrower than the constitutional right of privacy demands. I agree, of course, with the court's starting point: that the Alaska Constitution requires us to interpret liberally its protection against unreasonable searches and seizures, thus making us more inclined than other courts might be to find that a citizen's expectation of privacy is objectively reasonable.[1] I also agree with the court's conclusion that the "open view" doctrine applicable to ground-view observation cannot be "mechanically extend[ed] . . . to airborne surveillance";[2] citizens who can protect themselves from prying eyes at ground level by building tall fences cannot get the same protection from the air unless they cover all their outdoor living spaces — something a reasonable society does not demand of them. My only disagreement with the court's analysis is that it stops short of its inevitable conclusion.

The court decides that an aerial search requires a warrant when conducted with a "combination of flight and high-powered optics," because in those circumstances law enforcement officers have "the power to see enough detail of a person's private life just outside the home to corrode Alaskans' sense of security."[3] Because the aerial surveillance at issue here had this technological enhancement, the court declines "to decide whether aerial observation of the curtilage *without* vision-enhancing technology requires a warrant."[4] But I see no reason to leave this question unanswered.

As the court notes, while other courts are not unanimous in their treatment of this issue, some have come down decidedly in favor of a more expansive view of the

---

[1] Opinion at 10.

[2] Opinion at 20.

[3] Opinion at 25-26.

[4] Opinion at 25 (emphasis in original).

privacy right.[5]  The U.S. Supreme Court held in *California v. Ciraolo* that the Fourth Amendment does not protect citizens from aerial surveillance because "[a]ny member of the public flying in this airspace who glanced down could have seen everything that [the] officers observed"; thus any expectation of protection from aerial observation — even in a backyard protected by a 10-foot fence — was unreasonable.[6]  But four members of the court joined in a dissent written by Justice Powell, who highlighted the difference between air travelers' "fleeting, anonymous, and nondiscriminating glimpse of the landscape and buildings over which they pass" and targeted aerial surveillance by law enforcement officers intent on finding evidence of crime.[7]  In the first instance "the actual risk to privacy . . . is virtually nonexistent," whereas in the second the risk is obvious.[8]  Justice Powell concluded:

> Here, police conducted an overflight at low altitude solely for the purpose of discovering evidence of crime within a private enclave into which they were constitutionally forbidden to intrude at ground level without a warrant.  It is not easy to believe that our society is prepared to force individuals to bear the risk of this type of warrantless police intrusion into their residential areas.[9]

The supreme courts of California and Hawai'i have reached the same conclusion.[10]

---

[5]  Opinion at 30-31 n.116.

[6]  476 U.S. 207, 209, 213-15 (1986) (5-4 decision).

[7]  *Id.* at 223-25 (Powell, J., dissenting).

[8]  *Id.*

[9]  *Id.* at 224-25.

[10]  *People v. Cook*, 710 P.2d 299, 305 (Cal. 1985) ("Striking that balance [of societal and privacy interests], we must conclude that an individual has a reasonable expectation of privacy from purposeful police surveillance of his back yard from the air."); *State v. Quiday*, 405 P.3d 552, 562 (Haw. 2017) (following *Cook* to hold that "while a private citizen may tolerate casual glances by a passerby on a private, commercial, or government flight, this does not necessarily mean that an individual

These courts, and our court today, persuasively explain why a citizen's home and curtilage that are plainly visible from the sky may nonetheless be subject to a reasonable expectation of privacy, making the "open view" doctrine that applies at ground level inapplicable. That is enough of a basis on which to decide this case. If the open view doctrine does not apply to airspace, then the usual corollary that allows law enforcement officers to *enhance* that open view with commonly available technology[11] does not apply either; a warrant is required.[12] I would hold simply that Alaskans' reasonable expectation of privacy in the home and curtilage protects them from targeted surveillance from the air, and law enforcement officers must therefore obtain a warrant before conducting such a search with or without technological enhancements. Our constitutional privacy right should lead us to that rule eventually in any event.

---

thereby for[]goes his or her reasonable expectation of privacy from 'intensive spying by police officers looking for evidence of crime' in the curtilage of his or her home"); *see also State v. Bryant*, 950 A.2d 467, 481-82 (Vt. 2008) (holding that "targeted, low-level helicopter surveillance by the police of activities in an enclosed backyard is not consistent with [the landowner's legitimate expectation of privacy] — not without a warrant").

[11]    *See Cowles v. State*, 23 P.3d 1168, 1170-72 (Alaska 2001) (holding that when employee's desk was open to public view, surveillance of it by hidden video camera did not violate employee's reasonable expectation of privacy); *Daygee v. State*, 514 P.2d 1159, 1162 (Alaska 1973) ("That the officer's view in this case was aided by a flashlight is irrelevant. The flashlight beam merely illuminated that which would have been visible in the light of day."); *Elson v. State*, 633 P.2d 292, 295-96 (Alaska App. 1981) (holding that officer's act of raising "cocaine snifter" vial to streetlight to better inspect its contents did not remove it from "plain view" analysis).

[12]    *See Cowles*, 23 P.3d at 1170 (noting that "placing a hidden video camera in a house in order to record activities there without a warrant is prohibited just as is a warrantless entry to search for evidence"); *State v. Glass*, 583 P.2d 872, 881 (Alaska 1978) ("In the absence of limited exceptions, a search warrant should be obtained from an impartial magistrate, based on probable cause to believe that criminal activity will be discovered, before electronic monitoring of conversations should be allowed."), *modified in part on reh'g*, 596 P.2d 10 (Alaska 1979).